## THE IMPOCO. THE WESTERN HOPE. UNITED STATES v. IMPERIAL OIL, Limited.

(District Court, S. D. New York. December 29, 1922.)

**1. Salvage ⬚18—United States vessel held not "merchant vessel" under statute.**

A vessel owned by the United States, used as an army transport, and operated by the United States Shipping Board Emergency Fleet Corporation, while carrying for the War Department a cargo of army supplies consigned to various army officers, consisting of ordnance, aviation, mechanical, and engineering equipment, supplies, and material, freight being paid by the Treasurer of the United States, was not a "merchant vessel," under Shipping Act Sept. 7, 1916, § 9 (Comp. St. § 8146e), or Suits in Admiralty Act March 9, 1920, § 10, providing that vessels of the Shipping Board should be subject to all laws, regulations, and liabilities governing merchant vessels while employed as merchant vessels, and that the United States and the crew of a merchant vessel owned or operated by the United States shall have the right to collect for salvage services rendered.

**2. Salvage ⬚18—United States has inherent power to recover compensation for salvage services.**

The United States has the inherent right as an owner of a vessel to recover compensation for salvage services in accordance with the ancient doctrine of the maritime law, and this is not affected by acts of Congress showing a long practice of the United States not to ask for salvage compensation, though Congress may restrict the inherent right of the United States to claim salvage, but this was not done by Act June 30, 1864, § 29 (Rev. St. § 4652; Comp. St. § 8426), Act Dec. 22, 1837 (Rev. St. § 1536; Comp. St. § 2776), and Act Aug. 1, 1912 (Comp. St. §§ 7990–7994).

**3. Salvage ⬚26—Principal element in fixing amount benefit conferred.**

The principal element in fixing the amount of salvage compensation is the benefit conferred.

**4. Salvage ⬚26—Elements to be considered.**

The salvaged vessel should not be asked to pay for expenses incurred by salving vessel after the service ended, due to delay caused by difficulty in getting coal, or to pay for employment that the salving vessel might possibly have got, and negligence of the salving vessel should be considered, where it causes injury.

**5. Salvage ⬚34—United States and officers and crew allowed certain compensation.**

The United States, as owner of a vessel valued at $1,207,000, and the crew thereof, were awarded expenses for 9 days, $5,773, and for salvage, $25,000, three-fourths to the United States and one-fourth to the master, officers, and crew, in proportion to their wages, for the towing of a vessel of the value of $500,000; United States vessel being off of her course for 18 days.

In Admiralty. Libel by the United States, as owner of the steamship Western Hope, against the steamship Impoco; the Imperial Oil, Limited, claimant. Award to the libelant and interveners.

William Hayward, U. S. Atty., of New York City (John Hunter and Arthur H. Longfellow, both of New York City, of counsel), for the libelant.

Delancey Nicoll, Jr., of New York City, for interveners.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Cletus Keating and Edwin S. Murphy, both of New York City, of counsel), for claimant.

⬚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

WARD, Circuit Judge. This libel was filed by the United States on its own behalf, as owner of the Steamship Western Hope, as well as on behalf of her officers and crew, to recover compensation for salvage services rendered to the Canadian oil tanker steamer Impoco in ballast between March 27 and April 3, 1920. The master, chief engineer, and ten members of the crew subsequently intervened separately.

The Western Hope, owned by the United States and used as an army transport, was operated by the United States Shipping Board Emergency Fleet Corporation, which appointed Harris, Magill & Co., Inc., as its agents for operation and management. On the voyage in question from Barry, Wales, to the port of New York, the Western Hope was carrying for the War Department a cargo of army supplies, consigned to various army officers, consisting of ordnance, aviation, mechanical, and engineering equipment supplies, and material. The freight was paid by the Treasurer of the United States upon an account rendered to the United States by the United States Shipping Board, Harris, Magill & Co., incorporated agents, as to which a major of the Quartermaster Corps certified that all the "services were rendered as stated and that they were necessary to the public service." The claimant, admitting the right of the officers and crew of the Western Hope to recover, denies that the United States, as owner, has any right to do so.

The United States relies, in the first instance, on section 9 of the Shipping Act of September 7, 1916, 39 Stat. 728 (Comp. St. § 8146e), which provides:

"Sec. 9. * * * Every vessel purchased, chartered, or leased from the board shall, unless otherwise authorized by the board, be operated only under such registry or enrollment and license. Such vessels while employed solely as merchant vessels shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein, * * *"

—and on section 10 of the Suits in Admiralty Act of March 9, 1920 (41 Stat. 528), which provides:

"Sec. 10. That the United States, and the crew of any merchant vessel owned or operated by the United States, or such corporation, shall have the right to collect and sue for salvage services rendered by such vessel and crew, and any moneys recovered therefrom by the United States for its own benefit, and not for the benefit of the crew, shall be covered into the United States Treasury to the credit of the department of the Government of the United States, or of the United States Shipping Board, or of such corporation, having control of the possession or operation of such vessel."

[1] I agree with the claimant that the Western Hope was not a merchant vessel under these acts. There was no more merchandising about her than there was about The Western Maid, U. S. v. Thompson, 42 Sup. Ct. 159, 66 L. Ed. 299, 257 U. S. 419, and the observation of Mr. Justice Holmes that carriage of a cargo of food in that case was as little a matter of merchandising as would be the transporting of a regiment of soldiers, is even more applicable to the Western Hope.

287 F.—26

[2] Failing this, the United States relies upon its inherent right as an owner to recover compensation for salvage services in accordance with the ancient doctrine of the maritime law. Such services are voluntary, and they are just as voluntary in the case of men of war and public vessels generally as they are in the case of private vessels; i. e., it is no part of their duty to render such services. While I can see that a sovereign would and perhaps should consider it beneath his dignity to ask for compensation for services in saving property at sea, I can imagine no legal reason to prevent him from doing so. I know it was, and suppose it still is, the practice of the railroad companies never to ask compensation for salvage services rendered by their tugs in the harbor of New York. This was not because of any lack of right to do so, but out of a sense of propriety, which is an even more appropriate reason for the same practice pursued by the United States in case of its vessels.

The claimant relies upon certain acts of Congress which do show the long practice of the United States not to ask for salvage compensation, but which, I think, in no respect affect its right to do so. While Congress may restrict the inherent right of the United States to claim salvage, that right remains as usual until it is restricted. Legislation in England confirms this view in a striking manner. The Merchant Shipping Act of 1854, §§ 484 and 485, provide:

"484. In cases where salvage services are rendered by any ship belonging to her majesty or by the commander or crew thereof, no claim shall be made or allowed for any loss, damage, or risk thereby caused to such ship, or to the stores, tackle, or furniture thereof or for the use of any stores or other articles belonging to her Majesty supplied in order to effect such services, or for any other expense or loss sustained by her majesty by reason of such services.

"485. No claim whatever on account of any salvage services rendered to any ship or cargo or to any appurtenances of any ship by the commander or crew or part of the crew of any of her Majesty's ships shall be finally adjudicated upon unless the consent of the Admiralty has first been obtained, such consent to be signified by writing under the hand of the Secretary to the Admiralty, and if any person who has originated proceedings in respect of any such claim fails to prove such consent to the satisfaction of the court, his suit shall stand dismissed and he shall pay all the costs of such proceedings: Provided that any document purporting to give such consent and to be signed by the Secretary to the Admiralty shall be prima facie evidence of such consent having been given."

The United States may change its practice either by act of Congress or by executive authority, which, I must presume, directed this suit to be brought in its name, just as we presume in suits generally that the plaintiff has authorized suit. The acts relied upon are as follows:

The Act of March 3, 1800 (2 Stat. 16), now Act of June 30, 1864, c. 174, 13 Stat. 314, which regulated prize. It provided that, in case of recapture before any condemnation as prize, the courts should award salvage, no part of which should be decreed to the United States, but all should go to the captors and be distributed "as in the case of proceeds of property condemned as prize"; i. e., to the officers and crews of the public vessels of the United States concerned. U. S. Rev. Stat.

§ 4652 (Comp. St. § 8426). This is military salvage regulated by act of Congress and plainly recognized that but for the exception salvage would be distributed as usual.

The Act of December 22, 1837, U. S. Rev. Stat. § 1536 (Comp. St. § 2776), authorizes the President to employ public vessels adapted to the purpose to cruise along the coast in severe weather to afford aid to distressed navigators. Nothing is said about compensation and the United States has followed its usual practice in asking none from 'such vessels if, indeed, any could be claimed either by the United States or by the officers and crew, in view of the fact that the duty of rendering the services is imposed by law.

The Act of August 1, 1912, c. 268, 37 Stat. 242 (Comp. St. §§ 7990–7994), is intended to harmonize our law with the provisions of the salvage treaty adopted at the Third International Conference on Maritime Law held at Brussels in 1910 (37 Stat. 1658). The reservation in the act that "nothing in this act shall be construed as applying to ships of war or to government ships appropriated exclusively to a public service" (Comp. St. § 7994), was in the words of article 14 of the treaty, and was intended to exclude such vessels from the act as they were excluded from the treaty. It certainly was not, as the claimant contends, a limitation placed by Congress on the right of the United States to recover salvage compensation.

Coming, now, to the amount of compensation which the service deserves: Stipulations have been agreed upon by the proctors as follows:

That the value of the Western Hope at the time of the salvage services was $1,207,000, and the value of the Impoco as salved was $500,000; that the value of the coal consumed by the Western Hope from the time that she digressed to go to the aid of the Impoco during the period of towage, and until the Western Hope got back thereafter upon her course (18 days), was $5,530; that the value of the provisions consumed was $1,462; that the value of the water used was $281; that the proportion of the monthly pay roll of $5,848 paid to the crew was $3,507; that the expenses of the Western Hope at Fayal were $216; that the value of the gear lost or destroyed during the towage was $1,336—in all, $12,332.

That during the 18 days from the time of digression by the Western Hope to the time when she got back thereafter upon her course her value was $2,000 per diem.

The damages sustained by the Impoco as a result of the collision with the Western Hope was $4,386.

These stipulations were only as to actual values, it not being admitted by the proctors that recovery should necessarily be had therefor.

March 27, at 2 a. m., the Impoco, which had encountered very rough weather for some days on her voyage from Southampton, England, to New York, was lying disabled, without power to move her engines, because, her fuel oil having become mixed with water, it was impossible to make steam. In addition, she could not use her dynamo to operate her wireless system or her regulation lights. Thereupon she issued an S. O. S. call for help over her emergency wireless, which

was operated by dry cells and had a radius of 30 miles, as a result of which the Western Hope and three other steamers came to her assistance, one of which, having cattle on board, could not tow. The Western Hope was about 135 miles away, bound from Barry, Wales, to New York, and arrived about 6:30 p. m. Her services were accepted, because she was the only one of the vessels bound west.

The first plan was to tow on the southern route, via Bermuda to New York; but this was changed subsequently to St. John, New Foundland, and this to the port of Horta, Island of Fayal, one of the Azores, where she was safely anchored April 3d, after a service of 7 days and 560 miles of towage.

The Impoco was in no danger. Her hull was sound; her trouble being lack of motive power. Nor was the Western Hope or her master, officers, or crew exposed to any hardship or risk in rendering the salvage service, which was one of a low order of merit, practically of towage. The wind, according to the Western Hope's log, was 5 of the Beaufort Scale—that is, a fresh breeze 23 to 28 miles—on only two separate watches during the service. All of the rest of the time it was 4; that is, a moderate breeze 16 to 23 miles or under. But the towing hawser parted twice, March 27th at 8:30 p. m., and March 29th at 3:30 p. m., and on one occasion the vessels came into collision. The starboard quarter of the Impoco and the port quarter of the Western Hope came together, and, upon separating, the starboard bow of the Impoco and the port bow of the Western Hope came into contact, as a result of which it is admitted the Impoco sustained damage to the extent of $4,386.

The towing from March 29th at 3:30 p. m. to arrival at Horta, April 3d, was continuous and without incident. Another service was rendered there to prevent the Impoco fouling another anchored vessel; but it was short, because the hawser parted in 20 minutes, and proved to be unnecessary.

Each vessel blames the other for the mishaps above mentioned. All the towing hawsers used belonged to the Western Hope; the Impoco having none. March 27th, at 8 p. m., the first hawser, 90 fathoms of 4¾-inch wire and 120 fathoms of 5-inch wire was made fast to the forward bitts and around the house and mast of the Impoco. It parted at 8:30 p. m. across the stem of the Impoco as the result of a sheer either of the Western Hope or of the Impoco. The hawser should have been made fast to the anchor chain of the Impoco, to act as a spring; but, having no steam, she could not raise it from the chain locker by her winch, and what was done was the best that could be done that evening, though not very seamanlike. I think neither master at fault for this experiment.

A statement of facts, dictated at Fayal by the master of the Western Hope, and signed by him and by the master of the Impoco, which was put in evidence by the United States, says that after the first hawser parted the masters agreed that the 90 fathoms of 4¾-inch and the 120 fathoms of 5-inch wire should be shackled together and bent onto 50 to 60 fathoms of the Impoco's anchor chain the next morning. Instead of this, the master of the Western Hope, during the night,

joined the two wire hawsers by 120 fathoms of 8-inch manilla hawser doubled, making four parts 30 fathoms long, and the hawser so constituted was shackled the next morning onto 45 fathoms of the Impoco's anchor chain, which had been raised by hand during the night.

Towing began at 7:50 a. m. of the 28th, and at 3:50 p. m. the manilla hawser between the wire hawsers parted as a result of chafing in the shackle and the 5-inch wire hawser and 45 fathoms of the Impoco's anchor chain, after long efforts on the 28th and 29th to raise them, had to be cut adrift and were lost. In this way 31 hours were spent until towing began again at 3:30 p. m. of the 29th with a hawser of 90 fathoms of 4¾-inch wire bent onto 50 to 60 fathoms of the Impoco's anchor chain. I am convinced that this was an improper method of towing, because of the danger of the manilla hawser's chafing out in the shackle, as it actually did. If the wire hawsers, shackled together, had been bent to the Impoco's anchor chain, as was originally proposed, and was subsequently done with a much shorter hawser, I feel sure the towing would have been continuous from 7:50 a. m. of the 28th. The libelant's expert, Connell, seems to me to take the same view.

On the 28th, while the Western Hope was attempting to pass a heaving line to the stern of the Impoco to be carried forward to the bow, she came so close, within 25 feet, that the seas rolled the vessels together. This was a very dangerous method of passing the line and quite unnecessary, too, because it might have been sent over in a boat, as the master of the Western Hope admits.

It also appears that the crew, or a portion of the crew, of the Impoco, expressed their intention to leave the vessel if the Western Hope did not stand by. But this constituted a very small danger; the Western Hope did stand by, and the master and chief officer were determined, if she did not, to let none of the crew leave the vessel until it was found necessary to do so.

[3, 4] The principal element in fixing the amount of salvage compensation is the benefit conferred, and that is especially so in this case. Generally speaking, salvors must take the risk of events occurring subsequent to the service. The Impoco should not be asked to pay for expenses incurred by the Western Hope at Horta, due to delay caused by the difficulty of getting coal, or to pay for employment that the Western Hope might possibly have got, of which, however, there is no evidence in this case. The fact must also be borne in mind that through the negligence of the Western Hope the Impoco sustained the loss of part of her anchor chain and incurred considerable expense to repair collision damage.

[5] I award to the United States its expenses for 9 days (less the loss of gear), $5,498, and for salvage, $25,000—three-fourths to the United States and one-fourth to the master, officers, and crew, in proportion to their wages. Counsel may submit a decree.