### THE MARY S.
### THE ASTORIA.
### SLAYNE v. CONSUL FUEL CORPORATION et al.

### CITY OF NEW YORK v. SLAYNE.
#### Nos. 13681, 14436.

District Court, E. D. New York.

Dec. 4, 1936.

Thomas A. McDonald, of New York City, for libelant.

Max H. Davidson, of New York City, for Consul Fuel Corporation.

Paul Windels, Corp. Counsel, of New York City (Willard M. L. Robinson, of Brooklyn, N. Y., of counsel), for City of New York.

BYERS, District Judge.

These causes were consolidated for trial; in the first the owner of the coalboat Mary S. seeks to recover from the City of New York for damages said to have been caused by the ferryboat Astoria while engaged in salvaging the Mary S., and in the second the City seeks an award for the salvage services.

The first cause was instituted by libel filed February 28, 1933, against the Consul Fuel Corporation, because on December 6, 1932, the Mary S., being loaded with a cargo of coal at Perth Amboy, N. J., which was consigned to the respondent at its dock

at the foot of Washington Avenue, Long Island City, N. Y., was permitted to go adrift on that date, as a result of which the coalboat was said to have been damaged.

On August 21, 1933, an amended libel was filed, in which William J. Garvin, Inc., was joined as respondent, on the theory that the latter, as stevedore, was implicated in the negligent act whereby the coalboat went adrift.

A second amended libel was filed September 24, 1934, in which the City of New York was joined as respondent, and therein it was alleged that, after the Mary S. went adrift, the ferryboat Astoria attempted to render assistance and, while so doing, caused and allowed the ferryboat to come into collision with the Mary S. and caused her to swing alongside the ferryboat and strike it again; and that the Astoria placed the Mary S. outside of an ash scow which was moored and, in so doing, brought the port side of the Mary S. into collision therewith.

The fault of the ferryboat is charged as follows:

"In that those in charge of the ferryboat 'Astoria,' while attempting to render assistance to the coalboat 'Mary S.,' were negligent in causing the said coalboat 'Mary S.' to strike against the ferryboat and to strike against the aforesaid ash scow with damage resulting to the ferryboat 'Mary S.'"

A so-called cross-libel was filed in the second cause on November 20, 1934, and an amended cross-libel was filed November 6, 1935, in which the City makes claim for the salvage services so rendered.

The Mary S. was a coalboat, 101 feet long, having a beam of 24 or 25 feet, with 12½ foot sides. On December 12, 1932, she was carrying either 231 or 331 tons of coal—the exact tonnage does not appear from the testimony. Her capacity was 500 tons and her draft at the time is said to have been 2½ feet, leaving 10 feet of her sides above water.

She was made fast outside of one or two other coalboats at the foot of Washington Avenue, Long Island City, and broke adrift at about 3:00 o'clock in the afternoon, due to improper handling of her lines by either the consignee or the stevedore. The bargee was ashore when the boat was being moved, but says he was able to jump aboard just as the Mary S. was going adrift.

Washington Avenue runs about east and west and comes to an end in the easterly channel of the East River opposite Welfare Island, and the barge was carried stern first in a flood tide of the strength of about 3½ to 4 miles an hour up the river, and had reached a point opposite the northerly end of Welfare Island when the Astoria, making out of 92nd Street on the Manhattan side on her 3:00 p. m. trip to Astoria, observed the plight of the coalboat.

At that time two or three men were on board, namely, the bargee (if he was there) and two of the stevedore's hands who had attempted to move the boat from her original mooring. These men waved their arms and called for assistance, and the ferryboat responded, and is criticised for the way in which she attempted to avert disaster to the coalboat.

Had the Mary S. continued without assistance, she would either have crashed into the ferry slip on the Astoria side, or have been carried in the strength of the tide up through Hell Gate—perhaps to strand on Hog Back south of Wards Island.

It does not appear that there were any other vessels in the vicinity which could have rendered assistance, and the theory of the libelant's proof in the first cause is that the ferryboat negligently performed the salvage task which she undertook.

The evidence for the libelant (except as to damage) is confined to the testimony of the bargee; the two representatives of the stevedore who were on the boat were not called as witnesses, nor was their absence accounted for.

There can be no doubt that the ferryboat and the coalboat came into contact as the result of the Astoria's approaching the Mary S. in such a way that the latter struck the ferryboat on its port side forward, and that a line was put aboard from the ferryboat to the coalboat and the latter was pushed across the river into Hallet's Cove, a distance of about 350 feet, and there she was brought alongside the Frederick Starr No. 26.

Seventeen days later, a survey was held, which revealed damage on the starboard side of the coalboat at or near the stern, and also damage on the port side near the bow, both at about 3 feet below the deck

The testimony of the bargee is open to the following criticisms:

He says he went ashore at 1:00 p. m. and was absent for about fifteen or twenty minutes, and then returned to his boat; this leaves at least an hour and a half of his time and activity unaccounted for, because the drifting occurred at about 3:00 p. m. He says further that the Astoria struck his coalboat a hard blow and, as a result, the latter made three complete turns around, and that it took forty-five minutes to get a line aboard from the ferry. He says that a hole was stove in the coalboat that was so big that, if he had had another 50 tons of coal on board, the barge would have sunk; that "you could take a boy and shove him right through the hole without any trouble."

No one's testimony corroborates either of those statements.

He says that the Mary S. broke a piece off the ash scow, Frederick Starr No. 26, when landed alongside, and that the Captain of the latter "made an awful squawk." As to that, he is directly contradicted by the witness Gaudett, a representative of Starr, whose duty it was to inspect the latter's boats and report damage and make repairs thereto.

He said that the starboard side of the Mary S. was brought in contact with the Starr scow. As to that, he is contradicted by the disinterested witness Kienast and by the fact that the amended libel alleges that in this maneuver the ferryboat brought the port side of the Mary S. into collision with the Frederick Starr No. 26.

He said that no one boarded the Mary S. from the ferryboat to put a line on it, and that he, as Captain of the coalboat, would not have allowed such a thing. In this, he is directly contradicted by neutral witnesses whose testimony is accepted.

Again, that it took from 3:15 to 5:00 p. m. for the ferryboat to render such service as she did, while the credible testimony is to the effect that about fifteen minutes were consumed in the entire operation.

The foregoing incidents of the bargee's testimony suggest that he may not have been on board his vessel at all; and that his recital as to the handling of the ferryboat in a difficult situation requires strict corroboration.

The Mary S. was returned to her original mooring at about 5:00 p. m. by a tug sent for that purpose, and a day or so later the cargo was discharged; thereafter she handled at least one light load of coal before being taken to dry dock; the bargee said that he had her on the beach twice because she was leaking badly, but he could not state whether that was before or after December 6, 1932. The leaking would not be accounted for by damage which was only 3 feet under the deck, if a light load were handled, since 231 or 331 tons caused her to have a draft of only 2½ feet.

The circumstances which have been related as to the early steps in this litigation suggest that the claim against the City must have been an afterthought, at best. The decision in The Cape Race (C.C.A.) 18 F.(2d) 79, was rendered on March 7, 1927, over five years before this alleged happening, and that case teaches that the letting go of the coal barge from its mooring could not be regarded as the proximate cause of the damage, if the latter was caused by the Astoria; therefore the initial efforts to recover from the consignee and the stevedore would be consistent with a recognition by the libelant that whatever damage existed was in fact due to their negligence, and not to the failure of the Astoria to function efficiently in a salvage operation. It is impossible to view the libelant's claim otherwise than in the light of this consideration.

Coming now to the happening itself, it is found that the Astoria altered her course upon observing the plight of the Mary S. and veered so as to come alongside the coalboat. While her engine movements have not been shown according to an engine-room log, it is found that she proceeded only under a slow speed after making the turn, which was just sufficient to enable her to maintain steerageway against the flood tide; it is found that she did not strike the coalboat head on but was so handled that the Mary S. came into a contact with the ferryboat, which was audible to a witness 150 feet away, and that it was sufficiently strong to cause the boats to seem to mutually rebound; it would have been better if the maneuver could have been accomplished otherwise, but the Captain of the ferryboat realized that it was necessary to arrest the progress up the river of the coalboat, and he could not handle his own craft as easily or expertly as would have been possible if he had been maneuvering a tug. The Astoria is 151 feet long and has a beam of 84 feet. The pilot house was probably 20 feet from ei-

ther side, and it was difficult to calculate a glancing contact which would be gentle and at the same time accomplish its purpose.

What happened may or may not account for the damage found seventeen days after the event, but, if it did, negligence on the part of the ferryboat is not deemed to have been shown.

The damage on the port side forward on the Mary S. has not been satisfactorily accounted for in the libelant's testimony. If, according to the libel, it is said to have resulted from the landing of the coalboat alongside the Frederick Starr No. 26, it is to be excused as an inevitable consequence of the maneuver, having in mind that this was a cumbersome ferryboat trying to land the coalboat in a safe berth; if it is urged as having occurred because the Mary S. was brought around the bow of the ferryboat, it has not been proven.

The testimony of the neutral witness Kienast, who observed the entire happening from a distance of 150 to 200 feet, is persuasive to the effect that the ferry made the best of a bad situation and should not be criticised on the basis of the libelant's testimony. The case is thought to be clearly distinguishable from The Cape Race, supra, for the reason stated, namely, that a ferryboat could not be handled as easily as a tug, and that here there was no "close shaving" or approach at too great speed.

Accordingly, the libel in the first cause will be dismissed for failure of proof, with costs.

The second cause in salvage presents a difficulty not discussed in the briefs, namely, the right of the City to make a salvage claim at all. The Impoco (D.C.) 287 F. 400, 402, is probably sufficient to justify the assertion of the claim. The following language from the opinion is relied upon in this connection:

"Failing this, the United States relies upon its inherent right as an owner to recover compensation for salvage services in accordance with the ancient doctrine of the maritime law. Such services are voluntary, and they are just as voluntary in the case of men of war and public vessels generally as they are in the case of private vessels; i. e., it is no part of their duty to render such services. While I can see that a sovereign would and perhaps should consider it beneath his dignity to ask for compensation for services in saving property at sea, I can imagine no legal reason to prevent him from doing so. I know it was, and suppose it still is, the practice of the railroad companies never to ask compensation for salvage services rendered by their tugs in the harbor of New York. This was not because of any lack of right to do so, but out of a sense of propriety, which is an even more appropriate reason for the same practice pursued by the United States in case of its vessels."

This court could wish that the City had not asserted this claim, for obvious reasons, but that does not avoid the necessity for deciding it.

The cargo of coal might have been lost in whole or in part if the Mary S. had not been towed to a safe mooring, but there is no proof of the value of the cargo. The vessel itself might have suffered serious damage, but the testimony that it was worth $3,000.00 cannot be accepted without reservation. She was twenty years old at least, and the bargee says she was leaky. The chances are that a willing purchaser at $500.00 would have received a hearty welcome from her owner, in December of 1932. There was no particular danger to life or limb involved in the towing operation and, under all the circumstances, it is thought that an award of $200.00 is adequate, of which one-half should be divided equally between the Captain and Ainsworth, the deckhand, who went aboard the Mary S. in order to handle the lines from the Astoria.

Settle decree.