**LAMBROS SEAPLANE BASE, Inc.**

v.

**THE BATORY et al.**

**GDYNIA–AMERICA SHIPPING
LINES, Limited**

v.

**LAMBROS SEAPLANE BASE, Inc.**

Nos. 254, 255, Docket Nos. 23003,
23004.

United States Court of Appeals,
Second Circuit.

Argued May 14, 1954.

Decided Aug. 17, 1954.

Haight, Deming, Gardner, Poor & Havens, New York City (Richard G. Ashworth, and Robert L. Rosensweig, New York City, of counsel), for appellant.

Purdy, Lamb & Catoggio, New York City (Vincent A. Catoggio, New York City, of counsel), for appellee.

Before CHASE, Chief Judge, and HINCKS and HARLAN, Circuit Judges.

HINCKS, Circuit Judge.

The trial court found as follows. On August 8, 1953 the Batory, a Polish transatlantic liner with 500 passengers aboard, was proceeding eastward to Europe, Southampton, England, being its first port of call. When about twelve miles south of Fire Island and some fifty miles from New York, at 4:50 p. m., a seaplane was first sighted which proceeded to circle the ship from five to twenty times, "landed" on the water once briefly, took off, and again circled the ship. The pilot of the plane while in the air shouted that he was lost and without gas or compass. On direction of the master of the Batory by megaphone he landed again. The Batory's engines were stopped at 5:05 p. m.; the pilot was received on board at 5:35 and forthwith informed the ship's purser, who had been deputed to interview him, that the plane was one hired from Lambros, the appellee, and further, when asked what to do with the seaplane, replied, succinctly, "to hell with the plane." Thereupon, without further consulting the pilot of the plane, the Master proceeded to hoist the plane on board. This task was accomplished by 5:45 p. m. and a few minutes thereafter the ship resumed its eastward course. While this was going on the sea was smooth, the wind (at least in New York) was no more than ten miles per hour and the sun was shining. The findings import that notwithstanding the Master's testimony the Judge found that the visibility was at least 15 miles, as the Weather Bureau records at Battery Park showed. On that date the sun set at 8:03 p. m.

The rescued pilot of the seaplane in question had rented it from the libelant Lambros, a corporation engaged in the business of renting such craft with a base at Ridgefield Park, New Jersey, on the waters of the Hackensack River, and had left libelant's base in the seaplane at 12:45 p. m. on that day. When first interviewed aboard, he had given a Mexican name and represented his citizenship as Mexican: it was not until the Batory had resumed its eastward course that he gave his name as "Newton" and disclosed an American passport purportedly issued by the American Embassy in Mexico City.

Slightly after 6:00 p. m. the Master sent a wireless to the Batory's agents in New York, whose office, as he knew, was not open at night, informing them of the rescue and that "hydroplane hired from Lambros Seaplanes Hackensack New Jersey taken aboard" and that the pilot was grateful for his life and "glad to join Batory's cruise to Southampton." The message also stated that the pilot "ran out of gas and oil without compass too far to reach shore." When this message was sent the Master had only the pilot's say-so for these facts (which later turned out not to be true,[1] and had as yet caused no verification thereof to be made. An hour later a similar wireless message was sent to the New York Times motivated, according to the testimony, by a desire for good public relations. These were the only messages about the

---

[1]. The findings show that the seaplane was in fact equipped with a compass and that there was two inches of gas which "would have been sufficient to carry the plane * * * to shore." The testimony of libelant's witness and chief executive showed that two inches of gas "would probably represent about 60 minutes of flight, or less."

incident sent by the Master on August 8th, although he knew of the U. S. Coast Guard (which had a station on Fire Island) and of its activities in bringing assistance to ships in distress.

Before the Batory reached Southampton, Lambros by wireless demanded the return of the plane. Gdynia, the owner of the Batory, refused to return the plane unless transportation charges were prepaid. Lambros did not pay or offer to pay transportation. On arrival at Southampton the seaplane was delivered to the British Receiver of Wrecks with whom it was stored. It was eventually sold at public auction for a price insufficient to defray storage. It was implicit in the findings that neither Batory nor its owner, Gdynia, took steps to libel the vessel for salvage in any British court.

The trial court ruled that the ship was "grossly negligent in failing * * to return the plane to shore" and hence liable in damages; and that Gdynia's cross-libel for salvage be dismissed on the merits. We proceed first to consider the claim for salvage.

■■■ The appellee, Lambros, predicates error on an interlocutory ruling below which overruled its exception to the cross-libel based on a contention that a seaplane is not a vessel which is susceptible of salvage under the maritime law. That contention it also advanced as valid support for the decree below dismissing the cross-libel. As to this, in The Robert W. Parsons, 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73, it was held that canal boats drawn by horses on the Erie Canal were subject to maritime lien for repairs, the Court saying, 191 U.S. at pages 30 and 31, 24 S.Ct. at page 12: "In fact, neither size, form, equipment, nor means of propulsion are determinative factors upon the question of jurisdiction, which regards only the purpose for which the craft was constructed, and the business in which it is engaged. * * So long as the vessel is engaged in com-merce and navigation it is difficult to see how the jurisdiction of admiralty is affected by its means of propulsion, which may vary in the course of the same voyage, or with discoveries made in the art of navigation." And in Cope v. Vallette Dry Dock Co., 119 U.S. 625, 629, 7 S.Ct. 336, 338, 30 L.Ed. 501, in which it was held that a floating drydock permanently moored to the bank of the Mississippi and not designed or used for navigation was not a subject-matter of salvage merely because it floated, it was said that "ships" and "vessels," as terms to describe objects susceptible of salvage are terms "used in a very broad sense, to include all navigable structures intended for transportation."

These judicial tests as announced by the Supreme Court are plainly broad enough to permit inclusion of a seaplane amongst the vessels which are subject to salvage. There is an express dictum to that effect by Judge Cardozo in Reinhardt v. Newport Flying Service Corp., 232 N.Y. 115, 133 N.E. 371, 18 A.L.R. 1324. It has been held that when on land a seaplane is not subject to a maritime lien for repairs, with a judicial reservation that it might have status as a marine object "while afloat on navigable waters". United States v. Northwest Air Service, Inc., 9 Cir., 80 F.2d 804, 805.

In Noakes v. Imperial Airways, Ltd., D.C.S.D.N.Y., 1939, 29 F.Supp. 412, it was held that a New York-Bermuda passenger plane so constructed that it could alight and take off from the water, which had crashed when in mid-flight, was not a "vessel" within the Limitation of Liability Statutes, 46 U.S.C.A. § 183 et seq. To the same effect was the holding in Dollins v. Pan-American Grace Airways, Inc., D.C.S.D.N.Y., 1939, 27 F.Supp. 487. And in United States v. Peoples, D.C.N.D.Cal., 1943, 50 F.Supp. 462, it was held that a seaplane was not a vessel within the purview of a criminal statute, 54 Stat. 306, formerly 18 U.S.C.A. § 469,

directed against stowaways.[2] The foregoing seem to be the only American federal cases which closely touch the problem here involved.

The only case called to our attention which has held that a seaplane was not a marine object which under the maritime law is subject to salvage is Watson v. R. C. A. Victor Co., Inc., 1935 A.M.C. 1251. This was a British decision. As Professor Robinson, in his treatise on Admiralty (page 715) noted, the holding of that case was severely criticised and promptly overruled by the British Air Navigation Act of 1920, 10 and 11 Geo. V. Ch. 80, which expressly extended the law of salvage to "aircraft on or over the sea or tidal waters." In Benedict on Admiralty (6th Ed.) Vol. I, Sec. 58, it is noted that Ireland in 1936 adopted similar legislation.

To a parallel development of the maritime law through judicial decisions of the United States Courts of Admiralty, Congress has interposed no obstacles. In 1866, long before the advent of aircraft, Congress had passed an Act for the prevention of smuggling in which a "vessel" was defined as including "every description of water-craft * * * and contrivance used or capable of being used as a means * * * of transportation on or by water". 14 Stat. 178. The definition, without substantial change, appears as Sec. 3 of the Revised Statutes. It was re-enacted verbatim as Sec. 3 of the Act of July 30, 1947, which constituted Title 1 of the United States Code. 61 Stat. 633, 1 U.S.C.A. § 3. In Title 1 of the Code it is a part of "Chapter 1.—Rules of Construction" thus indicating that it was enacted as a rule for the construction of federal statutes generally. Obviously the language of the definition is broad enough to cover seaplanes, but we find no basis for taking this general rule of statutory con-

struction as indication of legislative intent to state or restate the general maritime law which is still, except for minor statutory modifications not relevant to the problem here, the source of the law which governs salvage at sea. The Impoco, D.C., 287 F. 400. Robinson on Admiralty (1939), p. 716; Benedict on Admiralty (6th Ed.), Vol. I, Sec. 58.

Even less determinative of the maritime law are statutory definitions adopted for application to particular statutes, such for example the definition both of "vehicle" and of "vessel" as exclusive of aircraft for purposes of the customs laws. 19 U.S.C.A. § 1401(a) and (b). In this category belongs the Air Commerce Act of 1926, 44 Stat. 572, 49 U.S.C.A. § 177(a), upon which the appellee chiefly relies, which for purposes of that act provided: "The navigation and shipping laws of the United States, including any definition of 'vessel' or 'vehicle' found therein and including the rules for the prevention of collisions, shall not be construed to apply to seaplanes or other aircraft or to the navigation of vessels in relation to seaplanes or other aircraft."[3] This provision also did not purport to touch the law of salvage.

However, we think it worth noting that the above quoted extract from the Air Commerce Act, in conformity with the London Convention of 1948, was amended in 1951, 65 Stat. 407, 49 U.S.C.A. § 177(a) to read as follows: "*Except as specifically provided in sections 143–147(d) of Title 33*, the navigation and shipping laws of the United States * * * shall not be construed to apply to seaplanes or other aircraft". (Emphasis supplied.) And this amendment of the Air Commerce Act was included in a sweeping amendment of the navigation laws, 65 Stat. 406, whereby Congress gave the President power to

---

2. This statute was amended in 1948 by defining an "aircraft" as therein used to include "any contrivance for navigation or flight in the air." 62 Stat. 802, 18 U.S. C.A. § 2199.

3. This act, by section 9, defined "aircraft" as "any contrivance now known or hereafter invented, used, or designed for navigation of or flight in the air" with exceptions not here relevant. 49 U.S.C.A. § 179(c).

promulgate navigation regulations for the prevention of "collisions involving waterborne craft upon the high seas" which regulations were stated to apply to "all aircraft of United States registry to the extent therein made applicable", 33 U.S.C.A. § 143, and to "all vessels and seaplanes upon the high seas", 33 U.S.C.A. § 144(a); which defined a seaplane as a "flying boat and any other aircraft designed to manoeuvre on the water", 33 U.S.C.A. § 144(c); and which also provided for a specified code of signals for use "When a vessel or seaplane on the water is in distress and requires assistance from other vessels or from the shore". 33 U.S.C.A. 147c. Although the amendatory Act of 1951, like all other federal statutes, was not intended nor effective either to state or to modify the maritime law of salvage, we think the Congressional recognition of the need to assimilate into the navigation laws the regulation of seaplanes, is a cogent suggestion that Courts of Admiralty, to whom in large measure Congress has been content to confide the development of maritime law; if they are to keep step with the times should similarly assimilate seaplanes into the maritime law of salvage. The underlying policy of the law to encourage salvage applies to seaplanes as well as to the other types of vessels long known to admiralty.

We note further that in 1931, the Senate ratified a treaty, known as the Pan American Convention on Commercial Aviation of 1928, with several Latin American nations, 47 Stat. 1901, which in Article XXVI provided: "The salvage of aircraft lost at sea shall be regulated, in the absence of any agreement to the contrary, by the principles of maritime law." Professor Robinson in his work on Admiralty (page 715, note 18) refers to the Paris Air Navigation Convention of 1919 and (page 716) to the Brussels Convention of 1938 which contained provisions to that effect. See also Knauth on Aviation and Salvage, 36 Col.L.R. 224 and Hotchkiss on The Law of Aviation (2d Ed.), page

88. Although no international convention appears to control our decision here, we think it well worth noting that there is this highly reputable concensus of thought expressed by those participating in the development of international law, which is in harmony with a development of the general maritime law in line with Gdynia's contention.

On all the foregoing considerations, we sustain the ruling below that a seaplane when on the sea is a marine object which is subject to the maritime law of salvage.

We next consider whether the other necessary elements of salvage were proved. To be entitled to salvage, it is, of course, necessary for the salvor to prove a reasonable apprehension that the salved property was in peril. We are not here concerned with a claim of life salvage: no such claim is made. However, for its bearing on the claim for property salvage we find it necessary to consider Batory's conduct in taking aboard the pilot of the seaplane.

In view of the pilot's request for "rescue" and his representations as to his need, we think it was altogether reasonable for the Batory to take him aboard. Especially is this so in view of 46 U.S.C.A. § 728 which makes it a criminal offense for one to withhold aid where human life is in danger. Even if prompt investigation had disclosed that the pilot's claim of peril had been exaggerated, the Master, without hazard of criminal sanctions, could not have refused his request to be taken aboard thus leaving him twelve miles from shore with only two inches of gas. And having once taken the pilot aboard, the Master was without legal power physically to eject him. It is plain that the pilot had no intention of voluntarily returning to the plane. On the facts there was no basis for inference that the plane became derelict because of Batory's wrongful conduct and indeed no such finding was made. Thus the plane when salved was a derelict.

■ It follows, we think, that Batory had a right, unrequested, to furnish salvage service to the derelict. True, there was no obligation to furnish such service. And a more limited salvage service might have been furnished by leaving the plane where it was with suitable lights and advising those concerned by wireless of her location. However, Batory was not legally required to forego more extensive service in favor of other salvors (including the owner) who might possibly, or even probably, arrive in time to save the plane,—not even in favor of salvage service by the Coast Guard without cost to the owner. Cf. Robinson on Admiralty, page 761. We are pointed to no case holding that a fragile vessel left derelict at sea and exposed to the hazard of a summer thunderstorm is not in peril enough to justify unrequested salvage service. Indeed, such a holding, we think, would be a most unwise innovation in the maritime law. We hold, rather, that Batory was entitled to take possession of the derelict and bring it to a place of safety.

■ Was right to salvage forfeited by carrying the plane to England instead of leaving it in safety at a nearer American port? In Western Transportation Co. v. The Great Western, D.C. N.D.N.Y. 1862, 29 Fed.Cas. page 788, No. 17,443, the governing rule was stated as follows:

"There is, however, no inflexible rule that salvors must take the property saved to the nearest convenient port, or retain the property for adjudication at the first port at which it arrives in safety. Post v. Jones, 19 How. 150 [15 L.Ed. 618]. In all their proceedings, they should act in good faith, and with reasonable skill and judgment; and, while they are entitled to protect their own interests by proper means, they must not forget or disregard the interests of the owners of the property saved."

See also Hartshorn v. Twenty-Five Cases of Silk, D.C.S.D.N.Y., 1841, 11 Fed.Cas. page 713, No. 6,168a. Cf. The Sapinero, 2 Cir., 5 F.2d 56. We think this principle as sound today as in 1862 when The Great Western was decided, although of course the intervening development of techniques in aid of marine shipping, such principally as wireless communication, may occasionally require a modified application of the principle.

■ In applying this principle it is proper and necessary to remember that amongst the factors which affect a salvage claim are the values not only of the vessel or property saved but also of the salvor vessel including the obligations under which the salvor vessel operates.[4] Time lost by a transatlantic liner, under obligation to transport some 500 passengers without avoidable delay, would obviously constitute a factor of large dimensions. And with Southampton, England, her next port of destination, obviously at least several hours would have been lost if Batory had put in at some unscheduled port in which to deposit the plane in safety or even if she had stood by for the indefinite period of time required for the arrival of other salvors, whom she might have notified by wireless. In this connection it must also be remembered that having once taken possession of the plane she could not, without hazard of a damage suit, abandon the plane, at least unless forced to do so by the perils of the sea, short of the time when she should place it in a place of safety in which it would be available to the owner, subject to a libel *in rem* for salvage if desired. Serviss v. Ferguson, 2 Cir., 84 F. 202. There was no evidence that there was a port nearer than New York suitable for

4. The evidence included in the appendix to appellant's brief do not show these values. However, Lambros in its libel alleges that the value of the seaplane plus the value of its loss of use thereof was $6,200. And Gdynia in its cross-libel alleges that the value of the Batory was in excess of $7,000,000 and that in addition to 500 passengers she was heavily laden with a general cargo.

entry by a liner of Batory's dimensions. And even if it would have been feasible for her to have entered some nearer port, the Master might reasonably have expected that considerable time would be lost in finding a safe place for the deposit of the plane pending its repossession by its owner. In practical effect, the Master, under constraint to make judicious use of the vast property interests entrusted to him, was confronted with need to make an immediate choice between two alternatives, *viz.*, the removal of the plane to a place of safety at his next port of call or its abandonment coupled with notice by wireless of its location.

In the case of The Annapolis, decided by the Court of Privy Council in 1862, Lushington's Admiralty Reports, Vol. 1, page 355, it was said (page 375) "that it would be dangerous to hold that if salvage service be actually furnished to a ship, she cannot be called upon to pay anything unless it can be shown that she either requested or expressly accepted service. In many cases the urgency of the case would be too great to admit of previous discussion, and if a salvor were required to prove such an agreement before he could recover, it is feared that there would be much slackness in cases which most require energy and activity." The court agreed "that it is sufficient if the circumstances of the case are such that, if an offer of service had been made, any prudent man would have accepted it." This was said as to the right of one claiming salvage on account of assistance to a ship lying at anchor in a harbor, fully manned. Here we are concerned with a derelict seaplane adrift twelve miles from shore with night approaching. We think the Master of the Batory might reasonably have believed that a *prudent* owner would have preferred to have its plane safe in Southampton to the hazard of destruction by a possible sudden summer squall before its salvage could be accomplished by others. So far as the evidence shows, the Master could not be

sure that even with prompt notice by wireless as to the location of the plane it could surely be salved by others. We find no evidence which justified an inference that the Master knew or should have known that even without intervention of a squall the plane would survive long enough to permit of salvage by others or would be without substantial value to the owner in Southampton if transported there. Clearly, we think, there was no basis for an imputation of bad faith which would preclude a recovery of salvage under the rule of the Great Western case, supra.

With these considerations in mind, upon the facts found here we hold that the Batory had a right not only to render salvage service by taking the plane aboard for removal to a place of safety but also, as an incident to the accomplishment of that proper objective, to remove the plane to Southampton, without imputation of negligence effective as a forfeiture of its salvage claim.

 It does not follow, however, that the decree dismissing the cross-libel should be reversed. For the plane was never brought into the jurisdiction of the court below; it has never been arrested on a libel *in rem;* and Lambros, the owner, is before the court only on Gdynia's libel served against it *in personam.* The law applicable to such a situation was well stated in The Emblem, 8 Fed.Cas. 611, at pages 613, 614, No. 4,434. There the court, after comment on the power of the Admiralty Court to satisfy a claim for salvage by the sale of property saved when libelled *in rem,* spoke as follows:

"But he [owner] is under no obligation to assert his right, by intervening with a claim. He may abandon his property if he pleases, and if he does so, and declines to make himself a party to the suit, no decree can be made against him. * * * If the owner wishes to receive his goods, before proceedings at law are instituted and the salvor

delivers them to him, a personal libel may be maintained for the salvage. * * * But this is solely on the ground of his possession of the property. All the authorities speak of the right of the salvor as attaching to the thing, and not as the foundation of any personal claim against the owner, independent of the goods saved. * * * But the saving of property, from the perils of the sea, creates no personal obligation against the owner, independent of his interest in the property saved."

It is true that the statement in The Emblem opinion that a personal libel will lie against the owner of salved property "solely on the ground of his possession" thereof, was *dictum* for purposes of that case. But the *dictum* was approved by the Supreme Court in The Sabine, 101 U.S. 384, 390, 25 L.Ed. 982, in which The Emblem, Fed.Cas.No.4,434 was cited (as reported in 2 Ware 61) for the proposition that if "the property saved is destroyed *after having been restored* or is clandestinely removed from the jurisdiction[5] * * * no doubt is entertained that they (the salvors) may proceed *in personam* against the owners of the salved property." (Emphasis supplied.)

United States v. Cornell Steamboat Co., 202 U.S. 184, 26 S.Ct. 648, 50 L.Ed. 987, on which the appellant chiefly relies, is not in conflict with the Emblem rule. For there it was implicit in the facts that the property saved had been repossessed by the owners with the result that the government's right to the duties already collected thereon was restored, or saved, to the government: on that ground it was held that the government could be held on a libel *in personam*. The court there cited the British case of the Five Steel Barges (1890), 15 P.D. 142, in which salvage was allowed for the salvage of two (out of five) barges in a suit *in personam* against respondents who were under contract to build the barges and deliver them to the British government. The salvage services were rendered to the barges in the course of their travel to the government and when saved the barges were in fact delivered to the government thus perfecting the respondents' right to receive their sale price. And the holding was that although title had passed to the government under its contract with the respondent builders, the respondents, under their contract, had sufficient interest in the property saved to subject them to personal liability for the salvage.

The rule, as established by these cases, modifies the Emblem *dictum* that possession of the physical property salved is essential to a libel *in personam:* one, other than the legal owner, having an intangible interest in the physical property may be so held. And thus modified, the rule is well established both in England[6] and in this country.[7] But in all the cases applying that rule, it appeared expressly or implicitly that by the salvage of the physical property, followed by repossession by the owner, the intangible interest therein of the respondent was not only saved to him but was also availed of by him. We suggest that the rationale of the rule lies in the thought that acceptance of the benefit subjects the respondents to that personal liability which would have attached to a request by him for the service rendered. No case cited to us and none that we can find goes so far as to hold that an owner of salved property who never requested salvage service and elects not to accept and possess the salved property when made available to him by the salvor, is personally liable.

The appellant, Gdynia, seems to think its position supported by Kennedy on

---

5. Here the property was not "clandestinely removed from the jurisdiction" by the owner. It was removed by the salvor who upon its deposit in England might have libelled *in rem* in a British court.

6. The Cargo ex Port Victor, 1901, P. 243 (C.A.); The Meandros (1925) P. 61, 68.

7. The G.L. 40, 2 Cir., 66 F.2d 764.

the Law of Civil Salvage (3rd Ed.), and refers particularly to pages 11 to 16. We think that authority looks the other way. For after referring to the case of the Five Steel Barges, supra, which, as we have seen, does not deal with the immediate point now under consideration, Lord Justice Kennedy quotes (p. 16) from Dr. Lushington's opinion in The Chieftain, a statement that a proceeding *in personam* "can only be where the property is in the possession of the proprietors themselves."

Nor is the point settled by Admiralty Rule 18, 28 U.S.C.A., whether read independently or against former Rule 19 which it superseded. For the final clause of Rule 18, on which appellee relies ("and/or in personam against any party liable for the salvage service") states merely a procedural rule: it does not purport to say that as a matter of substantive law an owner who has never repossessed his property is personally liable for salvage.

And so here, even if the plane was deposited with the British Receiver of Wrecks in Southampton for the owner's account so that Lambros had a right and opportunity there to repossess it, we conclude that, since Lambros did not in fact repossess, it is not personally liable for the salvage. The case here falls directly within the rule of The Emblem and the Sabine cases and not within the modification thereof recognized in Cornell Steamship and the Five Steel Barges. We know of no principle of the maritime law which fastens upon an owner of marine property personal liability to pay a reward for services to his property, whether by way of salvage, towage, repair or supply, absent both a request for the services and acceptance of the benefit thereof.

What has been said in an earlier section of this opinion as to the merits of Gdynia's claim for salvage in effect disposes of the issues raised by Lambros' libel for damages. We agree with the trial judge that a claim for conversion was not proved: if, as we have

held, Batory was entitled to salvage the plane, its conduct in so doing did not constitute a wrongful interference with Lambros' dominion over the seaplane. Likewise, we held, no cause for negligence has been proved such as to constitute a forfeiture of Batory's right to claim for salvage. The facts and reasoning on which that holding was based equally require the conclusion that Batory's conduct was not such as to constitute an independent ground of negligence. We find no evidence which warrants a finding that the Master, who necessarily had to decide promptly whether to salve or not to salve, acted unreasonably. To be sure, the proofs show that the plane suffered some minor damage in the process of removal. But neither the pleadings nor the proofs support a claim for negligence on that account.

Interlocutory decree on Lambros' libel reversed, with a direction that said libel be dismissed: decree dismissing Gdynia's cross libel, affirmed.