THE DOLCOATH and Cargo.

*(District Court, S D. Florida.   April 10, 1883.)*

1. SALVAGE—WHEN ALLOWED.
    To justify a salvage award it is not necessary that a vessel should be in such peril that it would be impossible for the master to relieve her; it is sufficient if the danger is such that it would be continued and increased by the delay necessary for him to do so.

2. SAME—STEAM-SHIP AGROUND.
    Where a steam-ship is aground on an open and exposed reef, and is relieved from the bottom by taking out some cargo and throwing overboard by direction of the master, those engaged may be entitled to a salvage compensation, although they carry out no anchor.

3. SAME—DUTY OF SALVOR TO AID MASTER.
    It is the duty of a salvor to aid the master in all ways, and he should in no case refuse assistance in the way proposed because they differ in judgment, unless there is unquestionably bad faith in the means suggested.

4. SAME—GOOD FAITH OF SALVORS—MEASURE OF COMPENSATION.
    Salvage service demands the utmost good faith in every relation with wrecked property, and it is as much the salvor's duty to assist in saving it from unnecessary expense after being brought into port as to rescue it from peril; and any trouble, detention, or expense caused or incurred thereby will be considered and compensated in the general award.

In Admiralty.

*G. Bowne Patterson*, for libelants.

*L. W. Bethel*, for respondent.

LOCKE, J.   This vessel, the British steam-ship Dolcoath, laden with a cargo of cotton and grain from New Orleans, bound to Antwerp, went ashore on the south-east point of North Key shoal, Tortugas, at about half-past 6 Saturday evening, March 31st of this year; running on a smooth and even, though hard, rocky bottom until she was driven up out of water about a foot and nine inches.   The master endeavored to back her off by the propeller, but, failing in this, commenced at midnight a jettison of cargo, and by 8 o'clock the next morning had thrown overboard, as he estimates, 50 or 60 tons of corn.   By this time the

salvors, licensed wreckers of this district, with five vessels and thirty-one men, had arrived and offered their services, but the master, hoping to float his vessel without their aid, and not agreeing to the terms which they named when he inquired what they would relieve his vessel for, and not understanding their suggestion to aid him and submit the determination of salvage to the court, declined their assistance and continued his exertions by carrying out a small anchor and six-inch hawser and heaving on it what strain it would bear; but this proving ineffectual, he at length called the salvors, who had returned to their vessels on board again, and directed them to lighten his vessel by discharging cargo into their vessels. They declined to do this until an anchor could be carried out, saying that it was always considered unsafe to lighten a vessel until an anchor had been run, and that the court would blame them for so doing, and that they did not consider it safe, in event of a change or increase of wind in this case, as they did not think the anchor and line he had run out sufficient to prevent her from driving higher upon the shoal as lightened; and it was not until the master agreed to relieve them of any responsibility, and threatened to report them to the court from which they had their licenses if they refused to assist him, that they went to work.

There is a slight difference in the statements of witnesses as to the time the salvors worked, but it appears that they commenced at about 9 o'clock Sunday evening and worked unremittingly until 3 or 4 the next afternoon, and after a short space of time, while considering whether to take the cargoes to Fort Jefferson or not, they commenced and worked until 12 midnight; then, after resting until 5 the next morning, they again worked until about half past 3 that Tuesday afternoon, when the steamer floated. They took on board their vessels 1,389 bags of wheat,—some over 100 tons,—which they informed the master could be landed at Fort Jefferson, about five miles distant, when they could return and reload; but he, fearing the delay, directed them to continue the lightening by throwing cargo overboard, which they did. They say that they also urged carrying out a heavy anchor and hawser and heaving upon it, but he did not believe it would have any affect, and considered lightening the only means of relief. They therefore continued throwing overboard until about 100 tons more of wheat had been jettisoned, when the vessel floated. After she floated the salvors attempted to put the cargo in their schooners on board again, but the wind having come around to the N. E. at about the time of her coming off, the sea so increased that it was impossible to lie along-side, and, having had her rail

broken in, the schooner that was endeavoring to discharge was compelled to drop off, when they all got under way for Key West.

The first night that the salvors commenced work the ship's company were so worn out that they needed rest and the salvors worked alone; the rest of the time they assisted, and much of the time the cargo was hoisted by the steam-power. The work was laborious, and it is not shown or claimed but what it was pushed forward with all the dispatch possible.

The only unusual questions which have arisen in this case have been on account of a difference in the views of the master of the steam-ship and the salvors regarding the means to be used in relieving the vessel from the bottom, and consequently the different class of service rendered; he thinking that a heavy anchor could be of no use and that it was necessary to lighten his vessel by any means, and they believing that constant and heavy strains upon a large hawser was the easiest, quickest, and most economical manner of getting her afloat. Under the circumstances they very properly yielded to his judgment, whether it was the better or not, and followed his directions in good faith.

The experience of the licensed wreckers of this district, and the numerous cases heard and decided in court wherein heavy anchors and large hawsers have rendered most efficient service in floating vessels hard aground, have satisfied all parties making any investigations of the matter that generally it is a safe rule to adopt to carry out an anchor before lightening any vessel aground, and particularly so where the vessel is lying so that a sudden change or an increase of the wind or sea might serve to crowd the vessel further ashore. This has been so often mentioned and commented upon from the bench as well as suggested from the bar that I am not at all surprised to hear that it was understood by licensed wreckers to be a rule of court binding upon them, and that they would lay themselves liable for a non-observance of it. But every salvage cause has to depend upon its own merits, and the means best fitted to the end must be used in each individual case.

The court can make no arbitrary rule for the use of means in rendering service. Judge MARVIN remarks, in his able work on Wreck and Salvage, 107: "Skill is shown in the adoption of means suited to accomplish the end. It is in the choice and use of the best means at command that good judgment is displayed."

In all cases the salvor must remember that he is to aid and assist the master in all ways, by information, advice, suggestions, and labor, and should in no case refuse assistance in the way proposed, be-

cause his judgment should differ from that of the master in charge, unless there is unquestionably bad faith in the means suggested. Without doubt the experience of the salvors for years on the coast fully satisfied them that they were acceding to a most unreasonable request, and unnecessarily and needlessly sacrificing valuable property, and prolonging a risk by discharging cargo without running out a heavy anchor, and justified them in protesting against the course, and demanding that they should be relieved of the responsibility of the result of their labors. Nor can there be any doubt about the good faith and anxiety of the master to do everything to relieve the vessel in the least possible time and with the least expense.

The question of when a vessel will float and just how much cargo must be discharged is always a question difficult to determine when a jettison is commenced, and without doubt he trusted that every ton, as it went over the side, would be the last required. It is true, the course pursued proved in the end successful, but only after a sacrifice of valuable cargo, and, although there may be a question whether a heavy anchor could have heaved her off before the time she floated as it was and saved a jettison of all or any of the last 100 tons of wheat, I can but think that the judgment of salvors was correct, and it should certainly have been tried. Had the same course been pursued by them voluntarily, and a jettison of cargo made before a resort to all the force that could have been possibly applied to the heaviest anchor and hawser that could have been laid out, I should have certainly considered them culpable, and deducted from any salvage they might have earned the value of the cargo so jettisoned.

Unquestionably the judgment of each was somewhat warped by personal interest, as in carrying out a heavy anchor they would be doing what the master could not do, and what might appear to be indispensable, while on the part of the master it is to be presumed that he considered that if he permitted the libelants to do only what he might possibly have done himself, their compensation should be less than it might otherwise be.

But what effect should the course pursued, and the changing of what might have been anchor service to a lightening service, have upon the compensation of the salvors, as the case stands? It is claimed in behalf of the libelants that they have accomplished the end desired and rendered such aid as was required and assisted in relieving the steam-ship from the peril she was in, and although it was by means which took longer and required more labor and sacrifice of cargo, it was by orders of the master and they are entitled to as full compen-

sation as if the same end had been accomplished by running out an anchor. In reply it is urged that the service was not a salvage service, but simply lightening of the vessel under the direction of the master, and was only what he could have done with his own crew, and therefore the service of the libelants was not essential to her safety. Among the principal ingredients of a salvage service is the danger of the vessel relieved, and of course the helplessness of those who are in charge may be considered in estimating this danger. Not that a master and crew must be utterly unable to extricate their vessel, or that destruction must be certain but for the aid rendered, before a salvage is earned; but the greater probability of loss without such aid, or the less able the master is to relieve her with his appliances, the greater the danger must be, and the more important becomes the ingredient of jeopardy. In this case, it is shown that the vessel could be relieved by a certain jettison, and that, had there been sufficient time, the master could have made the jettison without the aid of the salvors; but the question of time was a most important matter, and every hour the vessel was on the bottom she was in a certain degree of peril. Of this the master was well aware when willing to sacrifice a portion of the cargo in order to hasten her floating, instead of permitting the salvors to discharge and reload. It is to be presumed that the ship's company did everything they could, and the salvors worked from 34 to 36 hours with nearly three times the number of the crew and twice the force that could be furnished by the ship in extreme emergency. Their labor, therefore, represented at the least from 68 to 72 hours of labor of the ship's company, which would have been three days or more of risk on the bottom and a saving of about $3,500 worth of cargo received by the salvors' vessels which would have necessarily been lost if jettisoned by the crew of the steamer.

It must be admitted, therefore, that the service of the salvors was most valuable to the property, even admitting that she might have been got afloat by the master without their aid, by his incurring the risk of remaining ashore so much longer. The increase of wind from the north-east, a most dangerous point considering the situation of the ship at about her coming off, followed by a sea that rendered it difficult, if not impossible, for the vessels to lay along-side her to discharge, must have greatly increased her risk, had she still been on the bottom. I am of the opinion that for the safety of the vessel and cargo the services of the salvors were particularly required, and whether the same were rendered by lightening her or by running out

an anchor is immaterial, further than to show that she might be relieved by the former course and the latter may not have been absolutely necessary. The actual degree of peril she was in was in no way changed by her having been relieved by lightening, instead of by an anchor, and the amount of labor required and time necessarily occupied in floating her, as well as the state of the weather soon after her coming off, satisfies me that had it been left to the master's unaided exertions, the liability of loss or damage would have been considerable. As it is, she is in an uninjured condition, ready to proceed on her voyage.

As remarked in the case of *The Neto*, 15 FED. REP. 819, recently decided herein, the loss or necessity for the sacrifice of cargo, although without any fault on the part of the salvors, must reduce the value of the services to the owner so much. The insufficient appliances of salvors to render the services required, whether of men or vessels, must detract from their value, and this principle must apply in this case.

There have been few cases of salvage services rendered in this district by lightening alone, but without doubt there must have been some where, had that service been preferred, it would have been as successful as carrying out an anchor. In the case of *The Perit*, decided in 1867, the weather was fine and the vessel rested on a smooth and even, though hard, rocky bottom, and without doubt she could have been lightened by a jettison of cargo so as to have been taken off by a small anchor carried out by the master, but a heavy anchor was considered more expedient, and the entire property saved. In that case 8 per cent. was given on a valuation of $115,000.

The property in this case, as appears by appraisement, amounts to about $205,000, which is probably as nearly correct as can be estimated upon property of this class. This large amount will enable a compensation to be awarded the libelants, who are licensed and professional wreckers, and therefore entitled to consideration, which, in some districts, might be considered lavish liberality, without being a hardship to the owners. In consideration of the entire facts of the case, it is ordered that the libelants have and recover $9,575, together with the costs herein.

There has been one point suggested in behalf of the libelants which it may be well to mention. It has been urged that the salving vessels were not permitted to land their cargoes at the wharf, where they could have done so with greater dispatch, but kept them on board and placed them back on board the steam-ship, to their delay

and expense and a saving to the steam-ship. Salvage services require the best of faith in every relation to the saved property, from its commencement to a final parting with it, or sundering of all connection, and it is just as much the duty of the salvor to assist in saving wrecked property from unnecessary expense after its saving, as long as in his custody or control, as it is to rescue it from loss. The entire relation is as a whole, and all his doings in connection will be considered and compensated. It is not to be understood that one part of the services is to be compensated for and another rendered gratuitously, but for everything that is done for the property in good faith the salvor is entitled to equitable compensation. But the service, or the care bestowed after the property has been rescued and brought into port, is not to be separated from the former services and paid for by itself, but it may be considered in any decree.

In any case where a vessel is so uninjured as to require no repairs, and is ready to receive any cargo which has been taken out, and the master desires it replaced directly on board his vessel to save his owners expense, there is no reason why the salvors should not so replace it, and be entitled to have such service, if of any additional trouble or detention, considered in an award. This matter has been fully considered in this case, and such extra compensation as deemed just embodied in the award.

---

A situation of actual apprehension, though not of actual danger, makes a case of salvage compensation. *The Joseph C. Griggs*, 1 Ben. 83; *The Raikes*, 1 Hagg. Adm. 247: *The Henry Ewbank*, 1 Sumn. 400.—[ED.