## THE EASTERN GLEN.

## THE MARIE MAERSK.

## AMERICAN SOUTH AFRICAN LINE, Inc., v. DAMPSK–SELSK–SVENBORG et al.

District Court, S. D. New York.

Aug. 5, 1935.

Judgment in accordance with opinion.

Frank V. Barns, of New York City, for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (William H. McGrann and Harold B. Finn, both of New York City, of counsel), for respondents.

KNOX, District Judge.

American South African Line, Inc., owner of the Eastern Glen, here seeks to recover a salvage award for itself, and for the vessel's master and crew, for services rendered the steamer Marie Maersk, and her cargo, owned, respectively, by the respondents named in the caption.

The Marie Maersk is a twin screw tank motorship, constructed of steel. She is 466.3 feet long, has a breadth of 61.8 feet, a depth of 34.2 feet and is registered at 8,271 gross tons. On May 20, 1931, the vessel, which was valued at $600,000, left Curacao carrying about 4,000 tons of fuel oil, and 8,000 tons of gas oil, bound for Las Palmas, Canary Islands. The cargo was worth ˙ $80,000. When the voyage was about half˙ over, and in the late afternoon of June 6, 1931, a faucet on one of the consumption tanks in the engine room was accidently broken. Fuel oil thus splashed over the motors, and became ignited. Efforts to control and extinguish the fire proving ineffectual, the officers and crew launched life boats and temporarily abandoned the ship. The sea was smooth and the weather fair. After several hours, the fire seemed to have burned itself out, and at 12:15 a. m. of June 7 the ship's company again went on board. They then found the engines to be wholly disabled, the living quarters badly damaged and all provisions destroyed. The vessel's hull and cargo were without serious injury. Due to lack of power, the radio apparatus was out of commission. The ingenuity of some of the crew enabled them to improvise a radio transmitter by connecting a small dynamo to the emergency steering wheel. Through this instrumentality a call for assistance was broadcast at 11:30 a. m. of June 7. It was promptly answered by the Dutch steamer, Stuyvesant, then 370 miles away. She suggested that aid might be nearer at hand and, at 11:50 a. m. the Marie Maersk radioed another call. It was picked up by the Eastern Glen, 74 miles distant. Her master replied that he would assist ˙the disabled vessel. Holding course and speed until noon in order to take her midday position, the rescuing craft then went to eastward towards the location of the Marie Maersk. A deviation of about 60 miles brought the Eastern Glen close at hand at about 5 p. m. Thereupon, Captain Petersen, the master of the Marie Maersk, accompanied by his chief officer, put off in one of her life boats and proceeded to the Eastern Glen, being

received on board by Captain Holmgren, her master. For the purpose of clarifying some of the events which subsequently ensued, it should here be stated that the Eastern Glen is one of a fleet of freight and passenger vessels engaged in scheduled trips between this country and ports in Africa. She is 400 feet long, has a registered tonnage of 5,570 gross, and is equipped with triple expansion engines of 3,000 horse power. She is valued at $250,000 and upwards. At the time of her receipt of the S. O. S. from the Marie Maersk, she was in latitude 21.39 north, longitude 41.14 west, and bound on a regular run from an African port to Boston.

At the interview had between the two masters on the bridge of the Eastern Glen, Captain Petersen told Captain Holmgren about the fire, and what had happened as a result. Upon hearing of the situation and of Petersen's desire to be towed to Las·Palmas, Holmgren informed him of his inability to comply with the request, but offered to tow the Marie Maersk to Boston. Petersen acquiesced, and tendered a Lloyds "no cure–no pay" salvage agreement for signature. Holmgren refused to affix his name, insisting that the matter of compensation should await adjustment through "proper channels" at Boston. Thereupon, the men discussed the details of the towage operation. These were concluded with a decision to await the coming of daylight before attempting to put a line aboard the Marie Maersk. Provisions, together with a quantity of coal and fuel oil, were then taken from the Eastern Glen to the Marie Maersk. Coal was necessary in order that food might be cooked for the crew of the distressed vessel. The oil was needed for light.

The master of the Eastern Glen had suggested that the Marie Maersk's anchor chain be used·as a tow line. This was disapproved by Captain Petersen. His thought was that lack of power on his ship would make it most difficult to render the chain available. He had two new 14-inch grass hawsers in good condition, and said that these, in conjunction with certain steel cables with which the vessels were supplied, could serve as tow lines.

At daybreak of June.8, the work of rigging two lines began. Each consisted of a length of grass hawser, and anoth-

er of wire. The lines, 250 fathoms in length, ran from the bow chocks of the Marie Maersk to towing bitts on the stern of the Eastern Glen. When the vessels had been thus connected, the towing ship went ahead at slow speed, getting under way at 8:30 a. m. When the Marie Maersk felt the pull of the towing ship, and began to move, the engines of the salvor were put at full speed. All went well until 9 a. m. when the port hawser parted.

▇ As to what then occurred, the testimony of Captain Holmgren is illuminating. His description, in part, is in these words: "I immediately stopped the engines so as not to take any chance of the tow-line being caught in the propeller, the starboard tow-line in the meantime remaining intact between the two vessels. The Marie Maersk being a heavier vessel, due to that fact, that the parting of the tow-line caused her to sheer off to starboard. She picked up strain on the starboard towline and took a sheer, heading for the amidships of the Eastern Glen. The only possible thing I could do to avoid a very serious collision in being struck amidships, with 5,000 tons of ore in the ship, I, on the spur of the moment, had to take the lesser chance of maybe getting clear or getting struck in a less dangerous place. I ordered the Eastern Glen full speed ahead, threw the helm hard astarboard, and attempted to cross her bow, but due to the momentum of the Marie Maersk * * * being a heavier ship, she kept it longer than the Eastern Glen, and the Eastern Glen didn't pick up speed fast enough to clear her bow, so the Marie Maersk struck us on the port quarter just aft of the forward mooring chock. It was a glancing blow, and several feet above the water-line, which did not interfere with the seaworthiness of the Eastern Glen."

Witnesses for respondents testify that the Marie Maersk, which was being steered by hand, proceeded on her course while the Eastern Glen went to starboard. In a few minutes, the Marie Maersk, carrying greater way than the Eastern Glen, was almost abeam. At this juncture, the Eastern Glen put her engines ahead and attempted to cross the bow of the Marie Maersk, but, miscalculating her headway, came into collision with her starboard bow. Mention should also be made of the evidence of

libelant's crew to the effect that at the parting of the port line, the Marie Maersk sheered first to port and then, as the remaining towing line became taut, to starboard. Indeed, Captain Holmgren, before finishing his testimony, corrected a statement to the contrary, as contained in the excerpt of his evidence above quoted, and said such was the behavior of the Marie Maersk.

As I read the record, none of the testimony having to do with the sheers is quite conclusive. When the line parted, and each vessel was encumbered by an overhanging portion of the hawser, as well as affected by the strain that suddenly was transferred to the starboard line, I think it probable that each vessel sheered from its course. It is probable, too, that each made some undisclosed helm movement in order to correct such sheer as may have occurred. Due to the fact that the movement of neither vessel was observed in relation to a compass reading and that each likely deviated from its course, it is easily presumable that the persons who saw the change in headings may well have been deceived as to their actual direction.

Considerable point is made of the fact that eight minutes elapsed between the parting of the line and the collision. Within such period, it is said the speed of the Marie Maersk should have been noted, and appropriate steps taken to avoid her. In the light of the facts, I think the argument is without much weight. As clearly appears, both vessels were well separated, and substantially abreast, just before the collision. In order for them to get in this position several minutes would be required. When the line broke, the ships were about 1,500 feet apart, and moving at five knots. Before the Marie Maersk could get abeam, it would be necessary for her to cover not only 1,500 feet, but also such further distance as is represented by the way which was on the Eastern Glen, at the time her engines stopped. For this reason, it is obvious that the time element is not so important as would be the case had both ships been under control, and unaffected by abnormal conditions. It may also be surmised that Captain Holmgren was not anticipating such a severe sheer as occurred when the Marie Maersk came up hard on the starboard hawser. He was not regularly engaged in towing and wrecking operations, and should not be held to accountability in the same measure that might attach to one who follows that occupation. Being suddenly made to realize that his ship was in imminent danger of disaster, he was justified in seeking to reduce the danger to a minimum. In so doing, his acts should be viewed in the light of the emergency confronting him. Another maneuver, possibly, would have been better, but I am not disposed to hold him at fault. The start of the trouble was the breaking of a cable belonging to the Marie Maersk. Had Captain Holmgren cast off the broken line, and unshackled the one to starboard, he might have avoided collision. Had this procedure been followed, one cable would have been lost, and trouble in raising the forward end of the other would have been experienced. His movements were hampered by the weight of a heavy dangling cable end, and his ship was practically dead in the water. I am not disposed to treat him too harshly, and shall acquit him of actionable wrong. See Atlantic Transport Co., Ltd., v. United States (Ct. Cl.) 42 F.(2d) 583, 1930 A. M. C. 726. It follows that the owners of the Marie Maersk must pay for the damage done to the Eastern Glen.

Following the collision, temporary repairs were effected and the Eastern Glen again sought to serve the Marie Maersk. A single tow line was made up of the latter's anchor chain and a 6-inch wire hawser.

Had Captain Holmgren been permitted to use the anchor chain in the first instance, it is likely no collision would have occurred. He was kept from using it by reason of the obligation which rested upon him to defer to the judgment of the master of the Marie Maersk. See The Dolcoath (D. C.) 16 F. 264. By 8 o'clock p. m. the new line had been run between the two ships, and the tow was resumed. It terminated at 11:32 a. m. on June 12, and under a state of facts about to be related.

When Captain Petersen first saw Captain Holmgren, he requested that a radiogram advising the situation of the Marie Maersk be transmitted to her owners in Copenhagen. The message being delivered, the owners decided it was undesirable for the vessel to proceed to Boston. In the course of a day or two, and with the approval of Captain Petersen,

they arranged for two ocean-going tugs to go to the aid of the Marie Maersk, and take her to Las Palmas. These plans were consummated through messages passing through the wireless apparatus of the Eastern Glen, and Captain Holmgren thus became aware of them. He, also, was in communication with his owners. Upon June 10th at 9 p. m. Captain Petersen requested the Eastern Glen to cast him adrift. Instead of complying with this invitation Holmgren sent this message to the Marie Maersk: "We received same message from your owners stop this advice does not constitute orders you requested towage stop in my opinion from information at hand you are duty bound to continue under our tow and orders and fulfill your verbal contract stop however we are awaiting orders from our owners and will advise you immediately upon receipt."

On the next day, June 11, at 1:35 p. m. Petersen cummunicated with Holmgren in these words: "According to instructions just received I ask you again to stop and let go the hawser stop if not I will have to cut the chain before dark."

The message was relayed to the owners of the Eastern Glen and at 1:50 o'clock p. m. Holmgren advised Petersen that "According to instructions just received your and our owners are conferring in regard to this matter do not take any radical steps we expects instructions later in day."

At 5:27 p. m. nothing more having been heard from the Eastern Glen, she was sent this message: "Please to inform you that we will start to cut our anchorchain and as you refuse to cast off all damage to your ship on this matter will be at your own responsibility."

The following reply was elicited: "You are acting without direct orders from your owners you are taking a step the gravity of which you evidently do not seems to realize stop You will be held responsible for breaking without cause you gave your part of the verbal contract which you made and accepted when you requested and took a towline from us to be taken to Boston stop We are still awaiting the result of the conference of our respective owners and as yet yours have not given you direct orders merely their opinions. The greatest honour a seafarer has is the acceptance of a call for aid from a fellowman and the opportunity to bring safely to port one who has meet a misfortune stop Respect the traditions of your forefathers."

Meanwhile, the Marie Maersk was being towed away from the destination she desired to reach. No further messages were exchanged during the night. But at 5:30 a. m. of June 12, the Eastern Glen wirelessed the Marie Maersk as follows: "You are compromising your owners by not informing them definitely that you agreed to be towed Boston compensation to be left usual channel your owner is evidently putting on your shoulders the onus of breaking this contract that exists in fact between us of prior date to that between Maersk and Bugsier Towing Company and rash action you take may have very far reaching effects and will surely compromise your standing as an efficient shipmaster and you may even be severely censored by Seog Handelsretten this is the very least that would happen Stop Your owners are dodging the issue stop Insist on direct orders to let go for otherwise you will have to take all the blame they admit they cannot tell you what to do and thereby admit that legally you should carry out your contract with us at the same time hoping you will do their dirty work and leave them with clean shirttails kindly advise us of your opinion and what you are going to do."

It brought this terse comment from Captain Petersen: "Your kindly message received and I again ask you to stop and cast off so we can get our hawser in."

Captain Holmgren countered with this message: "Very sorry but we are unable to comply with your wishes however if you so wish we can arrange to go to New York as more favorable port for discharge and repairs in time past no master has yet taken such a drastic action thereby placing the very life of his crew in nobody (jeopardy) without honouring them by consulting their wishes in absence of direct orders from your owners I would suggest that your own conscience and care for the future decide your actions we are neither ethically morally or legally entitled to let go."

This correspondence came to an end with the following exchange at 10:50 a. m.: "As you still refuse to cast off I

will cut the chain; when signal flags go up take care of your propellers."

Capt. Holmgren replied with this message: "You are taking the consequences."

At 11:32 a. m. the chain had been severed close to the bow of the Marie Maersk, and she was adrift in a calm sea to await arrival of the tugs then bound towards her. One arrived alongside on June 18 and the other put in an appearance three days later. The flotilla thus formed got under way for Las Palmas reaching there upon July 2. When the Eastern Glen had been cast off by the Marie Maersk she proceeded to Boston arriving in that port three days behind schedule.

Upon the foregoing facts the controversy as to the salvage award, if any, is to be resolved. By way of assisting to that end, the parties have made a stipulation as to the values of the vessels concerned and their respective cargoes. It is this:

| | |
|---|---:|
| Value of Eastern Glen | $ 150,000 |
| Value of her cargo | 400,000 |
| Salved value of Marie Maersk | 450,000 |
| Salved value of her cargo | 80,000 |
| Expenses of Eastern Glen, incidental to services rendered | 2,453.49 |
| Collision damage | 2,099.40 |
| | $4,552.89 |

The first thing to be considered is the effect to be given to the Eastern Glen's insistence upon continuing the tow, after being asked to abandon it. Assuming, as I do, that this case sounds solely in salvage and not in contract, respondents cannot be held to have breached an agreement to be towed all the way to Boston. Under circumstances other than those here disclosed, I imagine libelants would be the last to rely on a specific agreement. Had a hurricane descended on the vessels during the towage, and grave danger been experienced, they would have had nothing to say upon the question of contractual liability. Moreover, the minds of the parties never met upon several of the essentials necessary to a binding agreement. Hence, any contractual element may be dismissed from the case. With this feature of the dispute at rest, I may say that Captain Holmgren should have ceased his services on behalf of Marie Maersk when he was so asked. See The Ragnarok (D. C.) 158 F. 694; also The Manchester Brigade (D. C.) 276 F. 410, 413. At the same time the judgment which impelled him to continue the tow unduly should not forfeit all right to salvage. When he came to the rescue of the Marie Maersk, her condition, and that of her master and crew, was one of great distress. Help was needed, and food was essential. Both were readily furnished. While the services involved little in the way of danger, they were meritorious, and are entitled to compensation. The situation here was wholly dissimilar to that which existed in The Richmond (C. C. A.) 219 F. 714, and the decision in that case should not control the result I shall reach. It will be quite enough if the Eastern Glen be deprived of compensation for services rendered subsequent to 9 o'clock p. m. on June 10, 1931 (the hour when the Eastern Glen was asked to let go), and if the award that otherwise would be given is somewhat modified. The deduction so to be made is warranted inasmuch as the undesired towage took the Marie Maersk out of the course she was to travel with the tugs that were to take her to Las Palmas.

As for the sum to be decreed in favor of the libelants, attention should be given to the fact that once the fire on the Marie Maersk was out or under control, her crew was in little danger from the elements. The ship was in a reasonably safe portion of the ocean in a period of the best weather. The fire was substantially over when the Eastern Glen arrived upon the scene, and none of her company so much as went on board the distressed vessel. Aside from supplying food, coal, and oil, the most that the crew of the Eastern Glen had to do was to rig the towing tackle. And this, under the prevailing conditions, was relatively simple. There is, therefore, no fair basis upon which to allow salvage, as suggested by libelant, in amount which shall be the equivalent of 10 per cent. of the value of the Marie Maersk and her cargo. This suggestion, of course, is predicated upon the assumption that the award should be the same as though the ship had been towed to Boston. But upon a somewhat similar set of facts which was before Judge Groner in The Manchester Brigade, supra, it was held that a salvage allowance should be "based upon

the time consumed as against the time which she [the salvor] would have consumed except for the severance of relations."

That case is likewise authority for the proposition that modern facilities of communications, and present day maritime developments, are to be taken into account in salvage cases, and that, as a result, rewards in such large percentages as formerly were granted are not now the ordinary rule. I agree. Nevertheless, I think, with Judge Groner, that a consideration of the desirability of monetary recognition for willing service is still to be borne in mind.

For approximately three days and four hours the Eastern Glen was at the beck and call of the Marie Maersk. In addition, it took perhaps four hours to leave her course and come alongside. She should, therefore, be credited with a time consumption of 3⅓ days. The Eastern Glen would have taken about 14 days to reach Boston. Had she towed the distressed vessel the entire distance, she would have been entitled, in my judgment, to 5 per cent. of the salvage value of vessel and cargo. This would amount to $26,500. To this should be added, by way of willing service recognition, the further sum of $5,000, making a total of $31,500. Giving heed to the time actually consumed, the Eastern Glen, on this basis, should have an award of $7,533. If now, this sum be reduced by $533 as a penalty for not casting off the Marie Maersk, I think substantial justice will be done the parties. The decree will provide for the following payments to libelant:

| | |
|---|---|
| Salvage | $ 7,000.00 |
| Expenses | 2,453.49 |
| Collision damage | 2,099.40 |
| | $11,552.89 |

The sum of $7,000 shall be divided between owners and the master and crew of the Eastern Glen as follows:

To owners $5,250.

Master and crew for division in proportion to their respective wages, $1,750.

Respondents' counterclaim for damages to the Marie Maersk is dismissed.

11 F.Supp.—63½