**HAMBURG–AMERICAN LINE et al. v.
UNITED STATES et al.**

**No. 4274.**

Circuit Court of Appeals, First Circuit.

May 10, 1948.

Arnold W. Knauth, of New York City (Henry G. Molina, of San Juan, P. R., on the brief), for Hamburg-American Line, appellant.

Thomas Kiernan, of New York City (Earle T. Fiddler, of San Juan, P. R., on the brief), for Swiss Bank Corporation, appellant.

Thomas F. McGovern, Department of Justice, of Washington, D. C. (Herbert A. Bergson, Acting Asst. Atty. Gen., Philip F. Herrick, U. S. Atty., of San Juan, P. R., and J. Frank Staley, Department of Justice, of Washington, D. C., on the brief), for United States of America, owner of the Omaha and Somers, appellee.

Joseph W. Bishop, Jr., Atty., Department of Justice, of Washington, D. C. (David L. Bazelon, Asst. Atty. Gen., William T. McCarthy, U. S. Atty., of Boston, Mass., Max Isenbergh, Sp. Asst. to Atty. Gen., and David E. Feller, Atty., Department of Justice, of Washington, D. C., on the brief), for Tom C. Clark, Attorney General, as Successor to the Alien Property Custodian, appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

These are consolidated appeals from an interlocutory order of January 30, 1947, and a final decree of April 30, 1947, as amended May 13, 1947, by the District Court of the United States for Puerto Rico, on a libel in rem filed by the United States on its own behalf and on behalf of the officers and crew of the U. S. S. Omaha and U. S. S. Somers for salvage service to the German motorship Odenwald, her cargo and freight. The final

decree and accompanying opinion are reported at 71 F.Supp. 314 (1947).

The Odenwald is one of many Italian and German vessels damaged by their crews prior to requisition by the United States. The other vessels were damaged in American ports, and those taking part in the sabotage were prosecuted under 18 U.S.C.A. § 502, and libels filed for forfeiture of the ships to the United States under 50 U.S.C.A. § 193. The story of the Odenwald, however, is unique; it was described by the District Judge as "one of the great dramas of American peacetime seamanship."

On the morning of November 6, 1941, the U. S. S. Omaha and the U. S. S. Somers while on neutrality patrol at approximately longitude 27.47 west and latitude 0.55 north, halfway between the hump of Brazil and the bulge of Africa, sighted a merchantman displaying American colors and the name "Willmoto Philadelphia" on her stern. She was apparently taking evasive courses. When hailed, she gave unsatisfactory answers, and she was ordered to heave to. A boarding party was dispatched from the Omaha. Before the boarding party arrived alongside, the merchantman hoisted the international flag signal meaning "I am sinking, send boats for passengers and crew". Upon coming alongside, the boarding party found that all of the company of the merchantman were in boats and, as the District Judge found, "had abandoned the said ship." Some detonations were heard within the merchantman. One of the company of the abandoned ship observed to the leader of the boarding party, "This is a German ship and she is sinking." The merchantman was in fact the German motorship Odenwald. The District Judge found as a fact "that the officers and crew of the Odenwald had attempted to scuttle their own ship after which they abandoned her."

After climbing aboard, the boarding party found that the holds were flooding with sea water, and that the vessel was in imminent danger of sinking. They consigned to the sea open cans of benzine and packages apparently containing bombs. A Navy diver descended into the Atlantic to find the origin of the leakage but was unsuccessful; during his attempt sharks appeared and were shot at by the other members of the party in an attempt to drive them away. Other members of the party went into the shaft tunnel and the bilges at great hazard. The boarding party, though receiving "no cooperation whatsoever from the officers and crew of the Odenwald," were successful in controlling and repairing the damage, and in so doing displayed "great skill, resourcefulness and courage." Had it not been for the efforts of the boarding party the Odenwald would have sunk. Subsisting on scanty rations, and in imminent danger of attack by German submarines, the 67 members of the boarding party, convoyed by the Omaha and Somers, brought the Odenwald to San Juan, Puerto Rico, on November 17, 1941, after eleven days at sea.

On the next day, the United States filed the present libel for salvage in the United States District Court for Puerto Rico, pursuant to which the vessel and cargo were attached by the marshal. The Hamburg-American Line, as purported owner of the vessel, appeared through its attorneys on December 10, 1941, and secured an extension of time within which to plead to the libel. No answer having been filed within the extended time, a default was duly entered on December 15. On December 30, proctors for the Line filed a motion to vacate the default and to permit it to appear and answer the salvage claim. Hearing on this motion was extended several times by consent of the parties.

Meanwhile, on December 13, 1941, the United States Maritime Commission requisitioned title to, and possession of, the Odenwald under the Act of June 6, 1941, The Idle Foreign Vessels Act, 55 Stat. 242, 50 U.S.C.A.Appendix, § 1271,[1] by a

---

[1] " * * * the President is authorized and empowered, through such agency or officer as he shall designate, to purchase, requisition, for any period during such emergency charter or requisition the use of, or take over the title to, or the possession of, for such use or disposition as he shall direct, any foreign merchant vessel which is lying idle in waters within the jurisdiction of the United States

resolution expressed to be "without prejudice to the rights of the United States under any libel or other proceedings against said vessel heretofore or hereafter effected or instituted." A copy of this requisition was duly served upon the marshal in custody of the ship, who complied by surrendering its custody. On December 27, 1941, the court, pursuant to a petition filed by the U. S. Attorney on behalf of the United States, entered an order approving the action of the marshal and directing him "to take all steps that may be necessary and proper in compliance therewith, and that due return thereof be made, without prejudice, however, to any of the rights of the parties under the Act of June 6, 1941, or to the proceedings heretofore instituted by the United States, or to any rights the United States may possess against said vessel, her cargo and freight."

The title to the cargo of the Odenwald was requisitioned by the Defense Supplies Corporation on December 24, 1941, under the Property Requisitioning Act of 1941, 55 Stat. 742, and Executive Order Nov. 19, 1941, No. 8942, 6 F.R. 5909, "without prejudice to the rights of the United States by way of salvage lien, or otherwise, or to any proceedings by the United States against the cargo or the vessel now or hereafter instituted." By order of December 27, 1941, the District Court, upon petition by the U. S. Attorney on behalf of the United States, approved the action of the marshal in surrendering his custody of the cargo, and ordered that a cargo surveyor be appointed to make an inventory thereof, and that the claim for just compensation for the cargo, and the proceeds thereof, should stand in lieu of the cargo in this proceeding, and that any sums paid on account of such compensation should be paid into the registry of the court, all "without prejudice to the rights of the United States by way of salvage lien or otherwise, or to any proceedings by the United States against the cargo or the vessel now or hereafter instituted."

On July 22, 1942, the Alien Property Custodian, pursuant to The Trading with the Enemy Act of 1917, § 5(b), 40 Stat. 411, as amended by The First War Powers Act of 1941, 55 Stat. 839, 50 U.S.C.A. Appendix, § 616, and Executive Order No. 9095, 50 U.S.C.A.Appendix, § 6 note, 7 F.R. 1971, as amended, vested in himself "all right, title and interest" of the Hamburg-American Line in the Odenwald, including "any claim against the United States for compensation for anything heretofore or hereafter done under the Act of June 6, 1941." This vesting was "without redress or right of compensation * * * except as may be otherwise provided by future legislation." The order recited that it was "in strict subordination to the rights of the United States including rights of forfeiture and salvage rights." Vesting Order No. 52, 7 F.R. 5738. On August 28, 1942, the Alien Property Cus-

* * * and which is necessary to the national defense: Provided, That just compensation shall be determined and made to the owner or owners of any such vessel in accordance with the applicable provisions of section 902 of the Merchant Marine Act, 1936, as amended (section 1242 of Title 46): Provided further, That such compensation hereunder, or advances on account thereof, shall be deposited with the Treasurer of the United States, and the fund so deposited shall be available for the payment of such compensation, and shall be subject to be applied to the payment of the amount of any valid claim by way of mortgage or maritime lien or attachment lien upon such vessel, or of any stipulation therefor in a court of the United States, or of any State, subsisting at the time of such requisition or taking of title or possession; the holder of any such claim may commence prior to June 30, 1943, or within six months after the first such deposit with the Treasurer and publication of notice thereof in the Federal Register, whichever date is later, and maintain in the United States district court from whose custody such vessel has been or may be taken or in whose territorial jurisdiction the vessel was lying at the time of requisition or taking of title or possession, a suit in admiralty according to the principles of libels in rem against the fund * * * and any decree in said suit shall be paid out of the first and all subsequent deposits of compensation; and such suit shall be commenced in the manner provided by section 2 of the Suits in Admiralty Act (section 742 of Title 46) * * * ." As amended by Act June 16, 1942, 56 Stat. 370, Act March 24, 1943, 57 Stat. 48.

todian petitioned the District Court to be substituted as a party in place of the claimant Hamburg-American Line, to have the claimant adjudged without any right, title or interest in the vessel, her cargo, or in any claims for compensation for the requisitioning thereof, or in the proceeds of such claims, and for an adjudication that any right, title or interest of the claimant, existing prior to the promulgation of the vesting order, had become vested in petitioner.

Hamburg-American Line moved to dismiss the cause as moot, on the ground that the Odenwald and her cargo had passed from the control of the court so that there was nothing upon which a judgment of the court could operate.

By order of December 9, 1942, the District Court disposed of several motions then before it: (1) It ordered the default opened and vacated, and permitted the Line to answer and contest the libel, on the ground that notwithstanding the aforesaid requisition by the Maritime Commission, and vesting order by the Alien Property Custodian, the Line still had an interest to litigate the question of salvage inasmuch as the amount of salvage would affect the amount of compensation for the property interests of the Line taken over by the Alien Property Custodian, as might be provided by future legislation. It also ordered a stay of proceedings during the continuance of the war. (2) It refused to dismiss the action as moot. (3) It permitted the Alien Property Custodian to intervene as a party in the case, but denied his petition to be substituted as a party in place of and to the exclusion of the Line. (4) It also adjudged that the Alien Property Custodian was vested with all the right, title and interest of the Line in the ship and cargo, and in any compensation that might thereafter be determined to be payable to it for the requisition of title to the ship and cargo.

At last, on February 8, 1943, the Hamburg-American Line filed its claim to the res, now in the asserted capacity of bailee of the vessel and cargo, alleging that the true owner of the vessel was Hamburg Rederei G.m.b.H., and that the owners of the cargo were unknown. On the same day it filed its answer to the libel, in which it denied that the vessel had been abandoned by her crew and that the libelants had performed any salvage service, and affirmatively set forth its own version of the episode.

On November 15, 1943, the Alien Property Custodian filed a claim to the just compensation payable for the requisitioning of the ship and cargo.

By an order of October 14, 1946, the prior order staying the proceedings during the continuance of the war was vacated and the cause was reopened for further proceedings.

Shortly thereafter, by Vesting Order 7928 of December 19, 1946, 11 F.R. 14636, the Attorney General, who had been made successor to the Alien Property Custodian under Executive Order No. 9788, 50 U.S. C.A.Appendix, § 6 note, 11 F.R. 11981, vested in himself the interests of the Hamburg Rederei G.m.b.H. to any claim for compensation arising out of the requisitioning of the Odenwald, subject to (1) the rights of the United States under its requisitioning orders, (2) the claim of the Maritime Commission for transporting the cargo to New Orleans,[2] and (3)

---

[2] By a decree of April 30, 1947, the District Court determined that the sum of $102,376.12 was due the United States Maritime Commission for the performance of certain necessary services in removing the cargo from San Juan, Puerto Rico, to New Orleans, Louisiana, and for certain expenses and charges incidental thereto, and ordered that sum paid to the Maritime Commission out of the sum of $1,856,582.73 in the registry of the court as compensation for the requisitioning of the cargo.

the salvage rights of the United States and the officers and crew of the Omaha. By the same vesting order, and subject to the same reservations, the Attorney General vested in himself any and all claims for compensation arising out of the requisitioning of the cargo and all moneys paid or to be paid into court on account thereof.[3]

On January 30, 1947, in response to a petition by the Attorney General as successor to the Alien Property Custodian, the court issued the interlocutory order now under review. It ordered that the Attorney General be substituted as a party in the place and stead both of the Alien Property Custodian and the claimant Hamburg-American Line; it adjudged the Line to be without any right, title or interest in the vessel, and decreed that any interest which the Line had prior to Vesting Order No. 52 had become vested in the petitioner. Further, the order adjudged and decreed that the Attorney General is "the sole and absolute owner of the motor vessel Odenwald, * * * her cargo, any and all claims to just compensation arising out of the requisitioning of said vessel and cargo by the United States, and all proceeds thereof." Notwithstanding the foregoing, it was· further ordered that "the claimant Hamburg-American Line is allowed the right to appear and defend against the libel in these proceedings as heretofore ordered on December 9, 1942." The Line filed its petition for appeal from this order on February 13, 1947.

On March 13, 1947, a petition for leave to intervene was filed by appellant Swiss Bank Corporation, which offered evidence that it had been the mortgagee of the Odenwald since December, 1940, and alleged that it would be entitled to receive the amount secured by the mortgage from any compensation paid for the vessel's requisitioning, after the payment of prior claims. It also filed an answer, praying for dismissal of the libel, or a subordination of the interest of the libelants to the claim of the Bank. By order of March 22, 1947, the Bank was permitted to intervene, but only "for the purpose of contest-

ing the claim for salvage or the amount therefor."

Trial of the salvage case commenced on March 31, 1947, and lasted two days. None of the testimony or documentary evidence presented in the District Court was made part of the record on appeal.

On April 30, 1947, the District Court filed its findings of fact, conclusions of law and opinion, and entered its final decree which is now before us on appeal. It found the facts as summarized above, and in addition found that the value of the Odenwald, for the purpose of determining the salvage awards, was $500,000 and the value of the cargo $1,860,000, and that the cost to the United States of the salvage operations amounted to $42,212.40. The court concluded that it had acquired and never relinquished jurisdiction; that the Odenwald was a derelict when boarded by the salvors; that the master could not lawfully scuttle the vessel; that the libelants were entitled to collect salvage in the aggregate sum of $397,424.06 with costs and expenses; and that the case was not one of bounty or prize.

The final decree, as amended, made the awards as follows:

To the United States, as owner of the Omaha and Somers for salvage .................... $30,000.00
To the United States, for expenses ..................... 42,212.40
To each member of the crew of the Omaha and Somers, with the exception of those who were members of the boarding and salvage party, 2 months pay and allowances.
To each member of the boarding and salvage party ...... 3,000.00

In addition, the decree ordered that the net proceeds of the sale of the cargo be deposited in the registry of the court, and that the Maritime Commission deposit in the registry of the court the proportionate contribution of the hull to the award, all to be disbursed by the clerk pursuant to the salvage award. Finally, the decree concluded with the following paragraph:

[3] It does not appear in the record who owned the cargo. Counsel stated to us that the cargo was owned by the now nonexistent German Reich.

"7. It is further ordered, adjudged and decreed that after all salvage awards, expenses and costs hereinbefore awarded shall have been paid the remainder of the proceeds of the vessel and cargo, including the remainder of all just compensation which may be made for the requisition of the vessel by the United States Maritime Commission and of the cargo by the Defense Supplies Corporation, and which may hereafter be deposited with the Treasurer of the United States or paid into the registry of the court, shall be paid to Tom C. Clark, attorney general, as successor to the alien property custodian, or to the officer of the United States acting as his successor in such capacity at the time of such payment."

The Hamburg-American Line and the Swiss Bank filed timely petitions for appeal from this decree, and the same were duly allowed.

Thereafter, on November 7, 1947, pursuant to The Idle Foreign Vessels Act of June 6, 1941, as amended, supra, note 1, the Maritime Commission deposited $10,000 with the Treasurer of the United States as partial payment on account of just compensation for the taking of the hull, and notice of deposit was published in 12 F.R. 7609.

We cannot accept appellants' contention that the court below lost jurisdiction in rem when the marshal surrendered possession of the Odenwald pursuant to the requisition order of the Maritime Commission. Such jurisdiction would be lost upon an unconditional relinquishment of possession, with no provision for a substitute res, for the practical reason that there would then be no subject matter upon which a decree of the court could operate, with the result that a decree would then be an ineffectual gesture and a nullity. Canal Steel Works, Inc. v. One Drag Line Dredge, 5 Cir., 1931, 48 F.2d 212. Such is not the case here. The obligation of the government to pay just compensation for the requisitioning of the vessel is not unlike the familiar stipulation for value. In the leading case of United States v. The Antoinetta, 3 Cir., 1945, 153 F.2d 138, at page 142, where the jurisdictional argument now advanced was rejected, the court said:

"The Act of June 6, 1941 provides that compensation for the use of requisitioned vessels shall be deposited with the Treasurer of the United States. This fund is, therefore, a substitute res and the courts' jurisdiction and dominion were extended to it. This is a sufficient answer to the claimants' assertion that in rem jurisdiction was lost by the requisitioning of the ships."

To the same effect see W. H. Stott & Co., Ltd. v. A/S D/S Vesterhavet, D.C. D.N.J.1941, 40 F.Supp. 637; The Pietro Campanella, D.C.D.Md.1941, 41 F.Supp. 656; Id., 1942, 47 F.Supp. 374; The Villarperosa, D.C.E.D.N.Y.1942, 43 F.Supp. 140; Id., 1942, 51 F.Supp. 107; The Sonora, D.C.S.D.Tex.1942, 50 F.Supp. 687; The Advance, D.C.E.D.Pa.1942, 45 F.Supp. 547, 548, 549; The Louise, D.C.D.Md.1945, 58 F.Supp. 445, 447.

It is no answer to the authorities just cited that in most of them the Maritime Commission requisitioned merely the use, not the title; the essential point was that in all of them the jurisdiction of the court in rem persisted notwithstanding its relinquishment in fact of possession of the vessel.

Nor is it a distinguishing feature that in most of the above cases the marshal of the court went through the form of appointing the master of the ship a deputy marshal for the purpose of preserving his custody of the res. Continued jurisdiction of the court in rem did not depend upon the presence or absence of this more or less symbolic gesture on the part of the marshal. The original language of the Act of June 6, 1941, quite clearly indicated that a vessel might be taken from the custody or possession of a court under the sweeping powers of requisition therein conferred. To make the matter doubly clear, § 3(c) of the Act of March 24, 1943, 57 Stat. 49, provides as follows:

"In the event that a vessel the title or use and possession of which is requisitioned or taken pursuant to * * * the Act of June 6, 1941 * * * is in the custody of any court, State or Federal,

it shall be the duty of all agents and officers of the court having possession, custody, or control of said vessel, forthwith upon the filing with the clerk of said court of a certified copy of the order of requisitioning or taking, and without further order of the court, to comply with said requisitioning or taking and *to permit the representatives of the United States Maritime Commission * * * to take possession, custody, and control of said vessel."* [Italics added.]

Evidently, therefore, the applicable statute does not contemplate that custody or possession of the vessel, symbolic or otherwise, is to remain in the court after requisition by the Maritime Commission under the Act of June 6, 1941. So far as we can see, the case for continued jurisdiction of the court below would not in any way have been strengthened had the marshal undertaken to assert a continued custody through the device of appointing the master of the Odenwald his deputy marshal. That formality, which was followed in some of the cases above cited, apparently derived from Ex parte Whitney Steamboat Corp., Petitioner, 1919, 249 U.S. 115, 39 S.Ct. 192, 63 L.Ed. 507, where a vessel in the possession of an admiralty court was requisitioned by the United States Shipping Board under authority of the Act of June 15, 1917, 40 Stat. 182, which was not the statute involved in the case at bar.

Furthermore, we are informed that several of the vessels involved in United States v. The Antoinetta, 3 Cir., 153 F.2d 138, supra, were lost at sea while under requisition by the Maritime Commission. Whether this fact was brought to the notice of the Circuit Court of Appeals in that case we do not know. The court held that the respective courts of admiralty retained their jurisdiction in rem notwithstanding the requisitioning. This result could not rest upon the basis of the symbolic custody of a then nonexistent vessel the master of which had been appointed a deputy marshal. The main point of the decision in that case was that the fund which the Maritime Commission was obligated to pay into the Treasury of the United States by way of just compensation for the requisitioning stood as the substituted res upon which the decree of the court could operate, and this would be true irrespective of the ultimate fate of the vessels.

■ The legislative purpose of the Act of June 6, 1941, can be fulfilled without reading in an implication that judicial proceedings pending against the ship at the time of requisition are to go for naught. Suppose, after a lengthy trial of a libel for salvage, but before decree, the vessel is requisitioned under the Act of June 6, 1941. In the absence of a clear mandate of Congress we decline to hold that the admiralty court thereby loses jurisdiction of the cause, and that the libelant must begin all over again, by filing a libel on the same claim for salvage, *in the same court,* under the Act of June 6, 1941.[4] Nothing in the language of the Act, nor, so far as we are aware, in its legislative history, warrants any such implication. It is significant that the Maritime Commission, which is the executive agency exercising the delegated power of requisition under the Act, expressly provided in its order of requisition that the taking was "without prejudice to the rights of the United States under any libel or other proceedings against said vessel heretofore or hereafter effected or instituted." Moreover, the court, in its order of December 27, 1941, made clear that, in approving the marshal's act of surrendering possession of the Odenwald, it nevertheless intended to retain jurisdiction of the pending libel for salvage. We hold that, under the Act of June 6, 1941, the fund required to be deposited in the Treasury on account of just compensation is subject to be applied to the payment of the amounts of salvage award as determined by the final decree now under review.

■ Nor is there merit in appellants' contention that, after the requisitioning of the vessel by the Maritime Commission and the substitution of the Attorney General for

---

[4] The court in The Advance, D.C.E.D. Pa.1942, 45 F.Supp. 547, pointed out the distinction between libel proceedings pending at the date of requisition and libel proceedings instituted after that date. The latter must be filed in conformity with the requirements of the Act of June 6, 1941.

the Hamburg-American Line by the interlocutory order of January 30, 1947, there ceased to be a case or controversy between adverse parties, so that dismissal of the libel was mandatory. East Tennessee, Virginia & Georgia R. Co. v. Southern Telegraph Co., 1888, 125 U.S. 695, 8 S.Ct. 1391, 31 L.Ed. 853; South Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co., 1892, 145 U.S. 300, 12 S.Ct. 921, 36 L.Ed. 712. After the ship was requisitioned, and before the intervention of the Alien Property Custodian, the claimant-appellant Hamburg-American Line was still a party actually contesting the libel. The same was true after the Alien Property Custodian had intervened and before substitution of the Attorney General. And although the curiously phrased order of January 30, 1947, purported in one of its paragraphs to substitute the Attorney General in all respects as a party in place of the claimant Hamburg-American Line, the order as a whole did not have that literal or practical effect, for the final paragraph of the order contained the qualifying language that "the claimant Hamburg-American Line is allowed the right to appear and defend against the libel in these proceedings as heretofore ordered on December 9, 1942." Hamburg-American Line thus necessarily retained its status as a party. See The Pietro Campanella, D.C.D.Md.1942, 47 F. Supp. 374, 379, 380; United States v. The San Leonardo, D.C.E.D.N.Y.1942, 51 F. Supp. 107, 110. It has in fact vigorously contested the libel both in the court below and here on appeal. Furthermore, the intervenor-appellant Swiss Bank Corporation has remained a party throughout the proceedings since its intervention pursuant to the order of March 22, 1947, for the purpose of contesting the claim for salvage.

■ Coming then to the merits of the claim for salvage, since the testimony and exhibits presented at the trial have not been included in the record on appeal as provided in Admiralty Rule No. 49, 28 U.S.C.A. following section 723, this court is in no position to review the facts; and we must assume that the findings of the District Court were adequately supported by the evidence. Nor have we any basis for reducing the amounts of the salvage awards as provided in the final decree. Considering the value of the interests at stake and the circumstances of the successful salvage services so far as they are disclosed in the findings of fact, the amounts awarded appear to be moderate and well within the precedents. See Oelwerke Teutonia v. Erlanger, 1919, 248 U.S. 521, 39 S.Ct. 180, 63 L.Ed. 399; The Lamington, 2 Cir., 1898, 86 F. 675, 685; The Gerbeviller, D.C.D. Mass.1929, 34 F.2d 825; The Shreveport, D.C.E.D.S.C.1930, 42 F.2d 524, 539. As to appellants' argument that the award should not have taken account of the expenses of the United States as the owner of war vessels which were at sea to inspect passing shipping anyway, it need only be said that salvage was not the ordinary function of the Omaha and the Somers, that considerable time was lost by these ships from their assigned jobs, and that the salvage operation subjected them to risks not ordinarily incidental to their neutrality patrol. Cf. The Impoco, D.C. S.D.N.Y.1922, 287 F. 400.

■ We cannot say as a matter of law that the facts as found by the District Court invalidated the court's conclusion that the libelants were entitled to collect salvage. See The Georgiana, 1 Cir., 1917, 245 F. 321; Usatorre v. Compania Argentina Navegacion Mihanovich, Ltda., D.C. S.D.N.Y.1945, 64 F.Supp. 370. When the salvage party approached the Odenwald, the master and crew had taken to the life boats, having finally abandoned the ship in the confident belief that she had received her mortal wound. They had waved good-by to her and consigned her to her expected doom, having displayed on her the flag signal "I am sinking, send boats for passengers and crew." To the surprise of her former crew, the salvors by skill and daring kept the derelict afloat and brought her to a safe harbor.

We think it is immaterial that the master had done his best, or his worst, to scuttle the ship. Whether, in so acting, he had the authority of the owner does not appear, but this again is of no consequence. The stricken derelict was in dire need of help, and that help was forthcoming. Assuming that the owner wanted at one time to destroy his ship, he cannot later change his

mind and claim his ship back except in subordination of the lien of the salvors without whose exertions she would not have been preserved for future use. This proposition is founded on the plainest dictates of equity.

It is urged that salvage services may not be forced on the unwilling. Benedict on Admiralty (6th ed. 1940) § 117. There are cases cited in this connection which go to the extent of holding that salvage services are not compensable when forced upon a vessel after an offer of assistance has been expressly rejected, the crew remaining on board capable of meeting the peril. This was the situation in The Choteau, C.C.E.D.La.1881, 9 F. 211. See also The West Harshaw, 2 Cir., 1934, 69 F.2d 521; The Eastern Glen, D.C.S.D. N.Y.1935, 11 F.Supp. 995; The Pohatcong, D.C.S.D.N.Y.1896, 77 F. 996. Indeed, in some of these cases the view seems to have been that the libelants had not rendered any real service at all because of the ability of the libeled ship to take care of herself. The case at bar is quite a different one; for here the Odenwald was lying helpless, with a prospect of imminent sinking, abandoned by her crew who thought she was beyond all saving. Baker v. The Tros, C.C.E.D.Pa.1874, Fed.Cas.No. 783, cited by claimant-appellant is also not in point, since there the assistance offered as a salvage service had been expressly rejected by the ship and later was given pursuant to an agreement between the libelant and the vessel's contract-salvor to the effect that libelant was to be paid by the contractor at the usual rates and "was to have no claim whatever upon the ship."

Certain collateral points remain for brief comment.

■ The interlocutory decree of January 30, 1947, adjudged that the Attorney General is "the sole and absolute owner of the motor vessel Odenwald." This was technically incorrect. See United States v. The Antoinetta, 3 Cir., 1945, 153 F.2d 138, 143. Prior to the issuance of Vesting Order No. 52 by the Alien Property Custodian and Vesting Order No. 7928 by the Attorney General as successor to the Alien Property Custodian (see above), the Maritime Commission had requisitioned title to the Odenwald under the Act of June 6, 1941, and such title still remains in the Commission so far as appears from the record. The Attorney General is merely vested with such right, title and interest in the vessel as belonged to Hamburg-American Line and Hamburg Rederei G.m.b.H. at the date of the respective vesting orders (such interests then being nil), and with the right, title or interest of these German companies in the claim to just compensation payable by the Maritime Commission on account of the requisitioning of the vessel. The interlocutory decree should be amended accordingly.

■ There is also a technical error in paragraph 1 of the final decree in so far as it directs the Maritime Commission to "deposit the proportional contribution of the hull of the Odenwald as ship owner's interest, to the salvage award in the registry of this court." So far as we know, the Commission has not complied with this direction. Payment of compensation by the Maritime Commission is governed by the Act of June 6, 1941, which requires the amount determined as just compensation to be deposited with the Treasurer of the United States. There is no provision of law making it the duty of the Commission to pay such compensation, or any part thereof, into the registry of the court out of whose custody the vessel was taken at the time of the requisition. Paragraph 1 of the final decree should be corrected accordingly. However, as we have above indicated, the fund required to be deposited in the Treasury by the Maritime Commission is subject to be applied to the payment of the vessel's proportional contribution to the salvage award; and the final decree should be amended to specifically so adjudge.

■ Finally, correction needs to be made in paragraph 7 of the final decree, which we quoted in full earlier in this opinion, so far as that paragraph directed that, after payment of all salvage awards, expenses and costs awarded in the decree, "the remainder of the proceeds of the vessel * * *, including the remainder of all just compensation which may be made for the requisition of the vessel by the United States Maritime Commission * * *, and which may hereafter be deposited with

the Treasurer of the United States or paid into the registry of the court," shall be paid to the Attorney General as successor to the Alien Property Custodian.[5] In that respect the final decree went beyond the limited scope of the salvage proceeding pending before the court below. Furthermore, neither the Alien Property Custodian, nor the Attorney General as his successor, has purported to vest in himself the whole of the fund payable by way of just compensation for the taking of the vessel; the two vesting orders above referred to had only vested in the Attorney General the right, title and interest of Hamburg-American Line and Hamburg Rederei G.m.b.H. in the compensation fund.[6] We see no conflict in this case between the procedural provisions of the Act of June 6, 1941, under which the Odenwald was requisitioned by the Maritime Commission, and the procedural provisions of The Trading with the Enemy Act under which the Alien Property Custodian operates. Under the Act of June 6, 1941, it is the duty of the Maritime Commission to deposit with the Treasurer of the United States the amount determined to be just compensation for the taking of the vessel. What the Attorney General as Alien Property Custodian has acquired by the aforesaid vesting orders will not be known, in terms of dollar amount, until the termination of proceedings which may be brought under the provisions of the Act of June 6, 1941, for the adjudication of other possible interests in the deposited compensation fund. Of course the intervenor Swiss Bank Corporation cannot enforce its asserted mortgage lien in the present salvage proceeding; its intervention was for the limited purpose of contesting a claim for salvage which, to the extent that it should be established, would diminish the mortgage security.

Except in the respects indicated in the foregoing opinion, the interlocutory order of January 30, 1947, and the final decree of April 30, 1947, as amended May 13, 1947, are affirmed and the case is remanded to the District Court with direction to amend the said interlocutory order and the said final decree in conformity with our opinion and for other appropriate proceedings.

[5] The money paid into the registry of the court by the Defense Supplies Corporation as compensation for the requisition of the cargo presents a different question. Not only was a different requisitioning statute involved, but, as appears above in our opinion, the Attorney General by the vesting orders vested in himself any and all claims for compensation arising out of the requisitioning of the cargo and all moneys paid into court on account thereof, subject to the salvage award. The present appellants have no standing to object, and make no objection, to the disposition of the remainder of the cargo moneys, as provided in paragraph 7 of the final decree.

[6] Vesting Order No. 52 out of abundant caution specifically provided that, "Nothing in this order shall be construed as impairing the right of compensation in accordance with the applicable provisions of the Act of June 6, 1941" of any person interested except Hamburg-American Line and "other enemies." Thus, it was evidently contemplated that other persons claiming an interest in the compensation fund deposited with the Treasurer, such as the holders of mortgage interests in the requisitioned vessel, might pursue their claims under the procedure set forth in the Act of June 6, 1941.